## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SIERRA CLUB<br>2101 Webster Street, Suite 1300<br>Oakland, CA 94612, | No. _____ |
| CENTER FOR BIOLOGICAL DIVERSITY<br>P.O. Box 710<br>Tucson, AZ 85702, | COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF |
| HEALTHY GULF<br>935 Gravier Street, Suite 700<br>New Orleans, LA 70112, | |
| TEXAS CAMPAIGN FOR THE<br>ENVIRONMENT<br>814 San Jacinto Blvd., Suite 408<br>Austin, TX 78701, | |
| and | |
| TURTLE ISLAND RESTORATION<br>NETWORK,<br>P.O. Box 370<br>Forest Knolls, CA 94933, | |
| *Plaintiffs,* | |
| v. | |
| NATIONAL MARINE FISHERIES SERVICE<br>1315 East-West Highway<br>Silver Spring, Montgomery County, MD 20910, | |
| and | |
| RICHARD W. SPINRAD, in his official<br>capacity as UNDER SECRETARY OF<br>COMMERCE FOR OCEANS AND<br>ATMOSPHERE and ADMINISTRATOR for<br>NATIONAL OCEANIC AND ATMOSPHERIC<br>ADMINISTRATION<br>1315 East-West Highway<br>Silver Spring, Montgomery County, MD 20910, | |
| *Defendants.* | |

## INTRODUCTION

1.      Plaintiffs Sierra Club, Center for Biological Diversity, Healthy Gulf, Texas Campaign for the Environment, and Turtle Island Restoration Network (collectively, Plaintiffs) challenge the National Marine Fisheries Service's (Fisheries Service) issuance of an arbitrary and capricious Biological Opinion (BiOp), regarding the effects on federally protected species and critical habitat from the construction, operation, and decommissioning of two massive deepwater crude oil export terminals in the Gulf of Mexico—Sea Port Oil Terminal (SPOT) and the Texas GulfLink Deepwater Port Project (GulfLink)—in violation of the Endangered Species Act (ESA) and Administrative Procedure Act (APA).[1]

2.      The Gulf of Mexico is one of the most productive and biodiverse ecosystems in the United States, providing a home to thousands of species ranging from simple invertebrates to highly evolved marine mammals including dolphins and whales. More than 30 species listed as either threatened or endangered under the ESA inhabit the Gulf. These include the critically endangered Rice's whale—one of the most endangered whales on the planet with about 50 individuals remaining—and the Kemp's ridley sea turtle, which is the most endangered sea turtle in the world.

3.      Oil and gas activities, particularly drilling activities, in the Gulf of Mexico have already caused grave harms to these species and their ecosystems, through oil and chemical spills, vessel strikes, noise, and more. For example, the BP *Deepwater Horizon* disaster in 2010 caused 4.9 million barrels of oil to spew underwater for 87 days, spreading throughout the Gulf and coating wildlife and ecosystems. The spill killed or seriously harmed billions, if not trillions,

---

[1] Fisheries Service, *Biological Opinion on the Deepwater oil exportation port construction, operation, and decommissioning, Continental Shelf in Galveston/Freeport area, Brazoria Counties, Texas* (Nov. 9, 2022).

of marine mammals, sea turtles, fish, birds, and other wildlife. In particular, the Rice's whale population experienced as much as a 22% loss as a result of the oil spill disaster.

4.      Oil and gas drilling activities will continue to cause grave harms to protected species. In its most recent biological opinion reviewing the impacts of all oil and gas drilling activities in the Gulf of Mexico over the next 50 years on protected species, the Fisheries Service estimated that vessel strikes from current drilling activities will kill or seriously injure nearly 25% of the Rice's whale's remaining population and that oil spills and noise will cause further harms. The Fisheries Service also estimated that vessel strikes from such activities will kill hundreds of thousands of endangered sea turtles and oil spills will kill thousands more.

5.      The SPOT and GulfLink deepwater export facilities will occur in the same region where oil and gas drilling activities already exist and would substantially exacerbate harms to protected species, by increasing the existing number and amount of oil spills, vessel strikes, and noise pollution over the 30-year lifespan of each project. The deepwater terminals would be located just seven nautical miles from one another, in and around highly sensitive habitats for numerous endangered and threatened species in the Gulf of Mexico, including the Rice's whale. The projects would encompass hundreds of miles of pipelines and other infrastructure. SPOT would export up to two million barrels of oil per day and GulfLink up to one million barrels per day. Together, these ports would allow exports of more than one billion barrels of oil-per-year on fully loaded Very Large Crude Carriers (VLCCs). Up to three of these super-tankers would travel each day through and near important habitat of protected species and increase vessel traffic in the area. The enormous scale of these two crude oil export projects—which has never been seen before in the United States—poses serious risk of oil spills, vessel strikes, underwater noise, and more that could devastate the Gulf and harm its imperiled wildlife and sensitive habitats.

6.      The ESA requires each federal agency, in consultation with the relevant federal wildlife service, to ensure that its actions are not likely to jeopardize the continued existence of any threatened or endangered species or destroy or adversely modify the critical habitat of any such species. This consultation process is a central feature of the ESA's framework for protecting endangered and threatened species.

7.      Because SPOT and GulfLink will have numerous effects on ESA protected species, the Fisheries Service engaged in ESA consultation on the projects with the U.S. Department of Transportation's Maritime Administration, which authorizes the deepwater oil export port license under the Deepwater Port Act, and with the U.S. Coast Guard, which prepares National Environmental Policy Act (NEPA) analyses for such ports. That consultation culminated in the issuance of a single BiOp by the Fisheries Service in November 2022, covering the effects on protected species and critical habitat from the construction, operation, and decommissioning of both the SPOT and GulfLink projects.

8.      The BiOp, however, is riddled with inadequate analyses and flaws that violate the ESA. For example, the Fisheries Service ignored impacts from the numerous oil spills that may occur throughout the 30-year lifespan of both the SPOT and GulfLink projects, focusing instead on a single flawed model of a worst-case credible discharge scenario of a pipeline rupture from SPOT and miscalculating impacts from that discharge. The Fisheries Service also arbitrarily concluded that the critically endangered Rice's whale and protected corals are not likely to be adversely affected by the projects based on irrational conclusions contradicting the best available science. The Fisheries Service also concluded that the projects would not jeopardize listed sea turtles based on unsupported assumptions that the turtles will swim away from oncoming vessels and in reliance on voluntary measures that would not even be in place during the projects'

operations. And the BiOp's incidental take statement fails to meet the ESA's legal requirements.

9.    Plaintiffs therefore ask this Court to declare that the BiOp is arbitrary and capricious and contrary to law, in violation of the APA and ESA, and to vacate and remand the BiOp to the Fisheries Service.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 (federal question) and 5 U.S.C. § 704 (APA).

11.    Venue properly vests in this District pursuant to 28 U.S.C. § 1391(b) and (e)(i) because Defendant National Marine Fisheries Service's headquarters are located in this District; Defendant Richard W. Spinrad, in his official capacity as Under Secretary of Commerce for Oceans and Atmosphere and Administrator for the National Oceanic and Atmospheric Administration, has his office in this District; and a substantial part of the events and omissions which gave rise to this action occurred in this District.

12.    This Court has authority to grant Plaintiffs' requested relief pursuant to the APA, 5 U.S.C. § 706(2), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

## PARTIES

13.    Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club is one of the oldest and largest conservation groups in the country, with about 637,000 members nationally in 64 chapters in all 50 states, the District of Columbia, and Puerto Rico, including over 14,500 members in Sierra Club's Maryland Chapter.

Sierra Club members use the public lands and waters throughout the Gulf of Mexico, including those that would be affected by the construction and operation of the deepwater export oil ports, for quiet recreation, aesthetic pursuits, and spiritual renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be harmed by the construction and operation of the deepwater export oil ports, including threatened and endangered species such as sperm whales, Rice's whales, and green sea turtles. Sierra Club members also observe and enjoy wildlife in the Atlantic, including the Kemp's ridley sea turtle. Sierra Club brings this action as representative of its members.

14.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the Center) is a nonprofit corporation that maintains offices across the United States and in Baja California Sur, Mexico. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Gulf of Mexico from the harmful impacts of offshore fossil fuel export terminals. The Center has more than 71,000 members, including members who live and recreate throughout the Gulf of Mexico and Atlantic coast. The Center brings this action as representative of its members.

15.     Plaintiff HEALTHY GULF is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect

and restore the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf has been actively involved in efforts to protect communities and the environment from the impacts of offshore oil and gas export terminals in this region. Healthy Gulf is headquartered in New Orleans, Louisiana, with offices in Pensacola, Florida and Madison, Mississippi. Healthy Gulf's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide. Healthy Gulf members regularly use, enjoy, and benefit from the marine environment of the Gulf of Mexico. Healthy Gulf brings this action as representative of its members.

16.    Plaintiff TEXAS CAMPAIGN FOR THE ENVIRONMENT (TCE), a 501(c)(3) non-profit corporation organized under the laws of the State of Texas, is a membership organization dedicated to informing and mobilizing Texans to protect their health, their communities, and the environment. TCE works to promote strict enforcement of anti-pollution laws designed to stop or clean up air, water, and waste pollution and also works across the state to preserve and protect wildlife and to advance protections for ecosystems and biodiversity. TCE has approximately 35,000 Texas members, including members living in the region of these proposed export projects. TCE brings this action as representative of its members.

17.    Plaintiff TURTLE ISLAND RESTORATION NETWORK (TIRN) is a nonprofit organization based in California. TIRN has been a leading advocate for the world's oceans and marine wildlife for more than 30 years. TIRN and its members work to protect and restore populations of endangered sea turtles and other vulnerable marine creatures—such as whales and dolphins—as well as marine biodiversity and ecosystems throughout the Gulf of Mexico and

along the Atlantic Coast. TIRN has over 212,000 members and supporters, including members who live and recreate along the Atlantic and Gulf coasts. TIRN brings this action as representative of its members.

18.     Plaintiffs' members regularly use, enjoy, and benefit from the marine environment of the Gulf of Mexico. Plaintiffs' members also regularly use, enjoy, and benefit from the presence of healthy marine life—including threatened and endangered species—within the Gulf of Mexico for recreational, aesthetic, commercial, scientific, and environmental purposes, such as whale watching, scientific study, boat touring, underwater diving, fishing, and photography. For example, at least one TIRN member regularly visits the Gulf of Mexico, including in and around the Flower Garden Banks National Marine Sanctuary, and enjoys viewing marine wildlife there. And at least one Healthy Gulf member regularly goes fishing in the Gulf of Mexico, including in areas within and directly adjacent to Rice's whale and sperm whale habitat, and enjoys viewing marine wildlife such as sea turtles there.

19.     In addition, Plaintiffs' members regularly use, enjoy, and benefit from the presence of wildlife that migrate from the Gulf of Mexico to the Chesapeake Bay and marine environments along the Atlantic Coast—including ESA-listed whales and sea turtles—for recreational, aesthetic, commercial, scientific, and environmental purposes, such as whale watching, scientific study, boat touring, underwater diving, fishing, and photography. For example, one Center member lives in Virgina and regularly looks for sea turtles, including Kemp's ridley sea turtles, loggerheads, and leatherbacks when sailing, walking on the beach, and engaging in other recreational activities in and near the Atlantic Ocean off Virgina. She derives great enjoyment from seeing these animals in the wild.

20.     The ability of Plaintiffs' members to pursue these interests hinges not only on the

well-being of threatened and endangered species that live, migrate, feed, and breed in areas affected by crude oil export infrastructure in the Gulf, but also on the health of the marine ecosystems on which these species depend.

21.    The Fisheries Service's failure to comply with the ESA and APA has caused and is causing Plaintiffs' members procedural harms connected to their substantive conservation, recreational, scientific, and aesthetic interests. Plaintiffs' members rely on the Fisheries Service to comply with the requirements of the ESA to guide federal authorizations of Gulf of Mexico deepwater oil export projects, so as to protect endangered and threatened species from harmful effects of such projects. Indeed, the Fisheries Service's role through the consultation process and execution of the BiOp is to ensure the long-term survival of endangered and threatened species.

22.    The interests of Plaintiffs' members have been, are being, and will be adversely affected by the Fisheries Service's violations of federal law, as described herein. These harms can only be remedied if the Court orders the Fisheries Service to comply with the ESA and APA. Plaintiffs have no other adequate remedy at law.

23.    Defendant NATIONAL MARINE FISHERIES SERVICE is the federal agency within the U.S. Department of Commerce's National Oceanic and Atmospheric Administration with responsibility for administering and implementing the ESA with respect to marine species. Specifically, the Fisheries Service has responsibility under the ESA for sea turtles (while they are in the water), whales and most other marine mammals, sharks, rays, corals, and marine fish. The principal offices of the Fisheries Service and the National Oceanic and Atmospheric Administration are located in Silver Spring, Montgomery County, Maryland.

24.    Defendant RICHARD W. SPINRAD is sued in his official capacity as the Under Secretary of Commerce for Oceans and Atmosphere and the Administrator of the National

Oceanic and Atmospheric Administration. The Administrator is responsible for implementing

and fulfilling the Fisheries Service's duties under the ESA. The office of the Administrator is

located in Silver Spring, Montgomery County, Maryland.

## STATUTORY BACKGROUND

### I.    ENDANGERED SPECIES ACT

25.    Congress enacted the ESA in response to the extinction crisis to "provide a means

whereby the ecosystems upon which endangered species and threatened species depend may be

conserved, [and] to provide a program for the conservation of such endangered species and

threatened species." 16 U.S.C. § 1531(b). The ESA's "language, history, and structure . . .

indicate[] beyond doubt that Congress intended endangered species to be afforded the highest of

priorities," with the intent to "halt and reverse the trend toward species extinction, whatever the

cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 174, 184 (1978). Accordingly, Congress made a

conscious choice to "give endangered species priority over the 'primary missions' of federal

agencies." *Id* at 185. Congress declared its policy "that all Federal departments and agencies

shall seek to conserve endangered species and threatened species and shall utilize their

authorities in furtherance of the purposes of [the Act]." 16 U.S.C. § 1531(c)(1).

26.    Congress defined "conservation" under the ESA as "the use of all methods and

procedures which are necessary to bring any endangered species or threatened species to the

point at which the measures provided pursuant to this chapter are no longer necessary"; that is,

when the species has recovered and no longer needs the protection of the ESA. *Id.* § 1532(3).

27.    In broad strokes, the ESA seeks to protect and recover imperiled species and

populations by first listing them as threatened or endangered based on enumerated statutory

factors. *Id.* § 1533(a)(1)(A)–(E); *see id.* § 1532(6), (20). The Act further requires the designation

of critical habitat for threatened and endangered species to protect the areas essential to the

species' conservation. *Id.* § 1533(a)(3)(A)(i); *see id.* § 1532(5).

28.    Section 7(a)(2) of the ESA requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." *Id.* § 1536(a)(2). In the context of Section 7, an "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" that are within the agencies' discretionary control. 50 C.F.R. §§ 402.02, 402.03.[2]

29.    The ESA and its implementing regulations establish an interagency consultation process to assist federal agencies in complying with this duty. An action agency, here the Maritime Administration and U.S. Coast Guard, must consult with the appropriate expert wildlife service—the U.S. Fish and Wildlife Service (for terrestrial species) or, as here, the Fisheries Service (for most marine species)—under Section 7 whenever it takes an action that "may affect" a threatened or endangered species or critical habitat. 50 C.F.R. § 402.14(a).

30.    If the agency taking the action (the action agency) concludes the action may affect listed species or their critical habitats, it must initiate formal consultation with the Fisheries Service, unless the action agency determines, and the Fisheries Service concurs in writing, that the action is "not likely to adversely affect" any listed species or critical habitat. *Id.* §§ 402.13(c), 402.14(a), (b)(1).

31.    Formal consultation requires the Fisheries Service to (1) evaluate the current

---

[2] The Fisheries Service recently revised its regulations implementing Section 7 of the ESA. 89 Fed. Reg. 24268 (Apr. 5, 2024). Those new regulations do not apply to the BiOp challenged here, which the Service issued in November 2022. *Id.* at 24269 (stating the revisions are "prospective" and are not intended to apply to previous consultations).

status and environmental baseline of affected species and critical habitats, (2) assess the effects of the action and cumulative effects on those species and habitats, and (3) analyze whether the effects of the action, when added to the environmental baseline together with any cumulative effects, is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. *Id.* § 402.14(g). At the conclusion of formal consultation, the Fisheries Service issues a biological opinion assessing the effects of the action and making a formal determination regarding whether the action is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h).

32.     The ESA regulations define "jeopardize the continued existence of" as, "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02.

33.     These regulations also define "destruction or adverse modification" of critical habitat as "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.* § 402.02.

34.     If the Fisheries Service concludes that the proposed action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, it must propose reasonable and prudent alternatives (RPAs), if available, that will mitigate the proposed action to avoid jeopardy and adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. §§ 402.02, 402.14(h)(2). RPAs must be capable of being implemented in a manner consistent with the intended purpose of the action, be within the scope and authority of the agency's jurisdiction, be economically and technologically feasible, and avoid the likelihood of jeopardizing the continued existence of the species. 50 C.F.R. § 402.02.

35.     Section 9 of the ESA prohibits "take" of endangered species by any person, which includes federal agencies. 16 U.S.C. § 1538(a)(1). "Take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." *Id.* § 1532(19).

36.     If the Fisheries Service concludes that the proposed action (or an RPA) will not jeopardize a listed species or adversely modify its critical habitat, but will incidentally take members of a listed species, it must include with the biological opinion an "incidental take statement" that specifies the amount of take that may occur without causing jeopardy or adverse modification of critical habitat, as well as the measures required to limit take. 50 C.F.R. § 402.14(i)(1).

37.     An incidental take statement serves several important functions, including acting as a check on the biological opinion's assumptions and conclusions, and provides for monitoring. *Id.* § 402.14(i)(3)–(4). The amount of take set out in the incidental take statement acts as a trigger that, if exceeded, invalidates the safe harbor and requires the agencies to immediately reinitiate consultation. *Id.* § 402.14(i)(5); *see Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 269 (4th Cir. 2018) (stating incidental take statement sets a "'trigger' that, when reached, results in an unacceptable level of incidental take" (citation omitted)).

38.     In formulating its biological opinion, the ESA mandates the Fisheries Service to "use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(g)(8).

## II.     ADMINISTRATIVE PROCEDURE ACT

39.     The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

40.     The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). An agency action is arbitrary and capricious under the APA where the agency (1) has relied on factors which Congress has not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) offered an explanation that is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43 (1983).

## STATEMENT OF FACTS

### I.     THREATENED AND ENDANGERED WILDLIFE IN THE GULF OF MEXICO

41.     The Gulf of Mexico is home to some of the most productive and biodiverse tropical and temperate habitats in the United States, including coral reefs, wetlands, seagrass beds, mangroves, *Sargassum*, and hard- and soft-bottom marine communities. These ecosystems support thousands of species of fish, whales and dolphins, sea turtles, corals, and other animals. More than 30 marine and coastal species living in and around the Gulf of Mexico are listed as endangered or threatened under the ESA.

42.     Several whale species, including the Rice's whale, sperm whale, fin whale, sei whale, and North Atlantic right whale, inhabit the Gulf of Mexico and are listed as endangered. The Rice's whale lives solely in the Gulf of Mexico and is one of the most endangered marine mammals on the planet, with a dangerously small population of approximately 50 individuals remaining. Evidence shows that the loss of a single Rice's whale could result in the extinction of this species. Small-scale incremental impacts over time or a single catastrophic event could also result in extinction.

43.     The Fisheries Service has proposed designating critical habitat for the Rice's whale in the Gulf of Mexico. 88 Fed. Reg. 47453 (July 24, 2023). Although the Rice's whale

was once believed to exclusively inhabit the northeastern Gulf, the Fisheries Service's proposed designation recognizes the recent science—that existed at the time the agency issued the BiOp challenged here—showing that the Rice's whale in fact "persistently occur[s]" in the western and central Gulf. *Id.* at 47460. Accordingly, the designation, as proposed, would include waters 100-meters to 400-meters deep along the entire Gulf continental shelf, as shown in the map below (Figure 1).



**Figure 1.** The Fisheries Service's proposed critical habitat designation for the Rice's whale.

44.    All five sea turtle species found in the Gulf are listed as endangered or threatened. The Kemp's ridley sea turtle (which is the most endangered sea turtle in the world), hawksbill sea turtle, and leatherback sea turtle are listed as endangered. The loggerhead sea turtle (Northwest Atlantic Distinct Population Segment [DPS][3] and green sea turtle (North Atlantic

---

[3] The ESA allows the Fisheries Service to separately list individual DPSs of species as threatened or endangered. *See* 16 U.S.C. § 1532(16) (defining "species" to include "any distinct

DPS and South Atlantic DPS) populations in the Gulf are listed as threatened.

45.     Among the Gulf of Mexico's fish species, the oceanic whitetip shark, giant manta ray, Gulf sturgeon, and Nassau grouper are listed as threatened, and the smalltooth sawfish is listed as endangered.

46.     Seven species of coral in the Gulf of Mexico are listed as threatened: boulder star coral, lobed star coral, mountainous star coral, elkhorn coral, staghorn coral, rough cactus coral, and pillar coral.

47.     Additionally, critical habitat is designated in or along the Gulf of Mexico for the loggerhead sea turtle, Gulf sturgeon, smalltooth sawfish, elkhorn coral, and staghorn coral.

## II.    THE SPOT AND GULFLINK DEEPWATER OIL EXPORT PORTS

48.     In January 2019, Enterprise Products Operating, LLC (Enterprise), a midstream oil company, submitted a license application to the Maritime Administration for a deepwater port crude export terminal: the Sea Port Oil Terminal (SPOT). SPOT would be the largest crude export facility ever built in U.S. waters. The port would be located approximately 30 nautical miles off the coast of Brazoria County, Texas, in water depths of 115 feet. SPOT's deepwater port project would encompass the newly constructed offshore platform and two 40-mile-long offshore pipelines, each 36 inches in diameter.

49.     SPOT's deepwater export terminal would simultaneously moor and load two Very Large Crude Carriers (VLCCs) (or other similarly-sized vessel). VLCCs are as long as the Empire state building's height with 71-foot drafts, and fully loaded, have carrying capacities of two-million barrels of oil. The SPOT terminal would have capacity to load 365 VLCCs per year, and is estimated to export up to 730-million barrels of oil per year—for 30 years. SPOT could

---

population segment of any species of vertebrate fish or wildlife which interbreeds when mature").

increase the nation's current crude oil export volumes by almost 50%.

50.    Export vessels serving SPOT would regularly traverse waters seaward of the deepwater platform infrastructure. SPOT estimates this will roughly double the vessel traffic in nearby areas. SPOT will also require numerous service vessels, including tugboats, supply vessels, and crew boats.

51.    In May 2019, the Maritime Administration received a license application for another massive facility to transport crude oil for export to the global market in U.S. federal waters: Sentinel Midstream, LLC's Texas GulfLink Deepwater Port Project (GulfLink). The GulfLink deepwater oil export terminal would be located only seven nautical miles from the SPOT terminal, and about 27 miles off Brazoria County, Texas, at a depth of approximately 104 feet. Like SPOT, GulfLink would add an array of pipeline, platform, and vessel infrastructure to the marine environment. Specifically, it would include a newly constructed offshore deepwater port terminal with crude loading infrastructure and a single, 42-inch offshore pipeline traversing about 28 nautical miles. Hundreds of loaded VLCC oil tankers would serve the project each year, along with other support vessels traversing the same Gulf waters as carriers servicing the SPOT project.

52.    The GulfLink offshore oil export terminal would have capacity to load a maximum of 15 VLCCs per month or about 180 VLCCs per year. This one-million-barrel-per-day export terminal would have an export capacity of 365 million barrels per year for 30 years. The GulfLink deepwater port stands to increase the nation's current crude oil export volumes by almost 25%.

53.    Both the SPOT and GulfLink deepwater ports are unprecedented. The terminals would be the first of their kind in United States waters to moor and fully load multiple VLCCs

simultaneously within a one-to-two-day period. Together, the two projects could increase the nation's crude oil export volumes by almost 75%. Only one other U.S. port, the Louisiana Offshore Oil Port, has the capacity to fully load a VLCC—and only at a rate of about one VLCC per month.

54.     The SPOT and GulfLink projects are not the only deepwater oil export terminals proposed off the coast of Texas in the Gulf of Mexico. The Bluewater Texas Terminal SPM would be located approximately five nautical miles off the coast of San Patricio County, Texas, and would have the ability to export 384 million barrels of oil per year. The Blue Marlin Offshore Project would be located 99 miles off Cameron Parish, Louisiana, with the capacity to export 730 million barrels of oil per year.

55.     In April 2024, the Maritime Administration issued a conditioned license to Enterprise for construction and operation of the SPOT deepwater port. Although the Maritime Administration has not yet issued a license for the GulfLink project, the Maritime Administration and the U.S. Coast Guard issued a final Environmental Impact Statement for the project on July 5, 2024.

## III.    SPOT AND GULFLINK WILL CAUSE HARM TO IMPERILED SPECIES AND SENSITIVE HABITATS IN THE GULF OF MEXICO

56.     The SPOT and GulfLink deepwater ports would be located in and around sensitive habitats for at least 17 endangered and threatened species in the Gulf of Mexico, including the critically endangered Rice's whale. Research demonstrates that Rice's whales persistently occur in the western Gulf, close to, if not within, areas of the SPOT and GulfLink deepwater port projects and along shipping routes used by tankers that would load at SPOT and GulfLink (compare Figure 1 with Figure 2). In addition, the SPOT and GulfLink ports' deepwater infrastructure and pipeline intersect with beaches near critical nesting sites for several

endangered species of sea turtles, including the critically endangered Kemp's ridley sea turtle.



**Figure 2.** Figure 15 from the BiOp depicting "likely shipping lanes" for project-related carriers for SPOT and GulfLink.

57.     These and other ESA-listed species are already overburdened from the existing

and extensive oil and gas development and infrastructure in the region. For example, threats such

as vessel strikes, vessel noise, seismic noise, marine debris, and oil spills associated with oil and

gas drilling affect a variety of ESA-listed species, including the Rice's whale. In fact, the

Fisheries Service, in a 2020 biological opinion, concluded that these five stressors from federally

authorized oil and gas drilling in the Gulf of Mexico jeopardizes the survival and recovery of the

Rice's whale.[4]

---

[4] Fisheries Service, *Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* (Mar. 13, 2020), https://repository.library.noaa.gov/view/noaa/23738/noaa23738DS2.pdf. The District of Maryland recently held that the Fisheries Service's biological opinion was arbitrary and capricious because the agency did not address all the stressors impacting the whale. *Sierra Club v. National Marine Fisheries Service*, Civ. No. DLB-20-3060, 2024 WL 3860211, at *28–32 (D. Md. Aug. 19, 2024).

58.     SPOT and GulfLink would exacerbate harms to the Rice's whale and other ESA-listed species in the Gulf, including by increasing the stressors that the Fisheries Service has determined are already jeopardizing the Rice's whale. Threats from these two oil export projects include oil spills, vessel strikes, noise pollution, and more.

59.     The substantial risk of frequent and significant oil spills from the SPOT and GulfLink projects threatens to devastate Gulf ecosystems and the array of wildlife that rely on these habitats for survival. As observed in the aftermath of the *Deepwater Horizon* disaster, oil spills can cause long-term and severe contamination to surface waters, deep waters, and bottom sediments. The approximately 4.9 million barrels of oil spilled during *Deepwater Horizon*, along with the approximately 47 thousand barrels of chemical dispersants that were applied, remained in the marine environment for many months, harming a wide range of flora and fauna. The spill contaminated over 43,000 square miles of surface water and over 1,300 miles of shoreline. Research indicates that toxic concentrations of invisible oil spread through the water column across an even larger area, extending past the Florida Keys and along the Atlantic Coast of Florida.

60.     Scientists estimate that the *Deepwater Horizon* spill killed or seriously harmed billions, if not trillions, of animals, including over 100,000 individuals of species listed as threatened or endangered. The population of federally listed sea turtles declined significantly, with about 4,900 to 7,600 large juvenile and adult sea turtles and about 55,000 to 160,000 small juvenile sea turtles perishing as a result of the spill. The population of Rice's whales declined by about 22%, and the population of federally endangered sperm whales declined by about 7%. The spill's harm to marine species and the environment continues to this day, with long-term population declines, altered ecosystems, and persistent contamination.

61.     Research shows that pipelines have high incidents of large spills. The offshore pipelines for SPOT and GulfLink would transport nearly 96 times the load of oil than any other pipeline project in the Gulf of Mexico. Based on the government's own spill frequency calculations for offshore pipelines, a spill frequency expert calculated that the SPOT offshore pipelines could have as many as 568 oil spills over the lifespan of the project, 20 of which would be large (greater than 1,000 barrels of oil); and that the GulfLink pipeline could have as many as 284 spills over its lifetime. And this estimate does not account for the spills that could result from vessel collisions, hurricanes, or spills that could occur at the loading terminal.

62.     The expansion of oil exports through the SPOT and GulfLink deepwater ports will also harm endangered and threatened species through associated vessel traffic, increased noise, and more. Ship strikes can kill and injure marine life through blunt force trauma or propeller strikes. Vessel strikes can occur anywhere, but collisions involving ships and whales are more likely to occur in areas with heavy vessel traffic. In addition, vessel traffic can result in sea turtle mortality from vessel strikes.

63.     High levels of low frequency noise, like that generated by vessel activity, result in significant biological impacts to whales and other marine mammals. Noise pollution from vessels can cause hearing loss or impairment and habitat displacement, increase stress levels, mask communication and environmental cues, change vocalization behavior as well as cause changes in diving and foraging that result in reduced reproductive success. In particular, recent scientific evidence demonstrates that underwater noise poses a heightened risk to the Rice's whale. Scientists have concluded that the Rice's whale is unlikely to compensate from noise induced impacts, leading to energetic and fitness consequences that could lead to extinction.

64.     The SPOT and GulfLink deepwater port projects would be located in areas that

21

are already heavy with commercial ship traffic, including large vessels.

## IV.    CONSULTATION AND BIOLOGICAL OPINION FOR SPOT AND GULFLINK

65.    From 2019 to 2022, the Fisheries Service engaged in ESA consultation with the Maritime Administration and the U.S. Coast Guard on the SPOT and GulfLink deepwater port projects. The Fisheries Service decided to batch the SPOT and GulfLink consultations into one BiOp because of the similarities between the projects, geographic locations, timing of initiation of consultation, and effects to ESA-listed species and designated critical habitat under the Fisheries Service's purview.

66.    On November 9, 2022, the Fisheries Service released the final BiOp covering the impacts of construction, operation, and decommissioning of both deepwater ports. In the BiOp, the Fisheries Service purported to analyze the effects of both projects on the sperm whale, Rice's whale, North Atlantic and South Atlantic DPS of green sea turtles, Kemp's ridley sea turtle, leatherback sea turtle, Northwest Atlantic DPS of loggerhead sea turtle, hawksbill sea turtle, giant manta ray, oceanic whitetip shark, elkhorn coral, boulder star coral, mountainous star coral, and lobed star coral, as well as loggerhead Northwest DPS critical habitat. The agency, however, failed to analyze impacts on other threatened species in the Gulf of Mexico, including the staghorn coral, rough cactus coral, and pillar coral.

67.    The Fisheries Service claimed that the potential for an oil spill related to the operation of the SPOT and GulfLink deepwater export facilities is the only impact from the projects that are likely to adversely affect some ESA-listed species. The agency claimed that other impacts, including vessel strikes and vessel noise, are not likely to adversely affect ESA-listed species.

68.    The Fisheries Service concluded that neither SPOT nor GulfLink are likely to adversely affect the critically endangered Rice's whale or the ESA-listed corals. The agency

concluded that the projects are likely to adversely affect, but are not likely to jeopardize the continued existence of, the sperm whale, green sea turtle, Kemp's ridley sea turtle, leatherback sea turtle, loggerhead sea turtle, hawksbill sea turtle, giant manta ray, and oceanic whitetip shark. The agency also concluded that the projects are likely to adversely affect but are not likely to result in the destruction or adverse modification of, designated critical habitat for the loggerhead sea turtle.

69.     The Fisheries Service's conclusions of no adverse effects, no jeopardy, and no adverse modification to critical habitat are arbitrary and capricious due to numerous flaws in the underlying analyses.

### A.     Oil Spill Risk Analysis

70.     The BiOp claims that oil spills related to the SPOT and GulfLink deepwater oil export ports are the only threat likely to adversely impact some ESA-listed species. The Fisheries Service stated that, "[b]ased on decades of experience with oil and gas transportation projects in the Gulf of Mexico," it is reasonable that "one or more oil spill(s) associated with the proposed actions will occur over the next 30 years." Nevertheless, the Fisheries Service concluded that oil spills from the GulfLink and SPOT projects would not jeopardize any ESA-listed species or adversely modify critical habitat. This conclusion is based on incorrect assumptions and a flawed analysis of oil spill risk from the two projects.

### 1.     Arbitrary reliance on a flawed worst-case credible spill scenario

71.     In analyzing the effects of crude oil spills on species, the Fisheries Service claimed to analyze a "worst-case credible discharge scenario" for oil spills from both projects. However, instead of developing its own worst-case credible spill scenario, the Fisheries Service deferred to a third-party consultant's Worst Credible Oil Spill Discharge (WCD) scenario for a pipeline rupture, modeled for the Maritime Administration and U.S. Coast Guard's NEPA

analysis for the SPOT pipelines (687,272 barrels of crude oil). This WCD scenario represents only an estimate of the worst-case credible scenario for an acute spill from a *pipeline rupture* from the SPOT project. Yet the Fisheries Service assumed, without any reasonable basis, that this WCD scenario represents the largest volume of oil that would be spilled and the broadest affected aquatic area from *both* the SPOT and GulfLink projects for *any type of spill* over the 30-year period of the projects' operations. Contrary to the agency's characterization, the SPOT WCD does not represent an accurate worst-case scenario of credible oil spills from the two projects, both individually and cumulatively. It is therefore unlawful for the agency to rely on this WCD to assess effects on species.

72.    First, the Fisheries Service's claim that the SPOT WCD scenario represents the largest volume of oil that could be spilled is inaccurate because it represents a worst credible discharge from a pipeline rupture only. The agency failed to consider spills of any size that could occur from other sources, like the buoy loading station or VLCCs transporting oil after leaving the terminals due to vessel strike or other accident. Moreover, the Fisheries Service failed to analyze whether those spills could result in an even bigger spill than the WCD estimate from a pipeline rupture. The Fisheries Service also provided no support for its flawed assumption that spills from these other accidents, in addition to spills from pipeline rupture, would not exceed the WCD estimate from just a pipeline rupture.

73.    Second, the SPOT WCD does not represent the largest volume of oil that could be spilled from both projects because it represents a worst credible spill from the SPOT project only. Even though the BiOp purports to analyze impacts from both the SPOT and GulfLink projects, the Fisheries Service's sole focus on the SPOT WCD ignored that spills are likely to occur from both projects, including successive spills and concurrent spills (e.g. in a severe storm

scenario impacting both, nearly adjacent facilities). Each of these two massive deepwater oil export projects consist of an export terminal, large subsea areas of connected pipelines, crude processing and buoy infrastructure, and hundreds of fully loaded tanker trips each year. Each project would be an independent source of oil discharge. Without analyzing both the SPOT WCD and the GulfLink WCD together, the Fisheries Service cannot claim to have considered the true worst credible discharge from both ports.

74.     Indeed, the Fisheries Service stated that, based on its experience with oil pipelines in the Gulf of Mexico, analysis of a worst credible oil spill discharge is warranted due to "[the] sufficient degree of certitude" associated with such worst-case scenarios occurring. Yet the Fisheries Service arbitrarily decided that only SPOT's pipeline rupture WCD is worth analyzing, despite the "sufficient degree of certitude" of a worst credible pipeline rupture also occurring from the GulfLink project.

75.     Third, the SPOT WCD scenario represents one discrete, acute spill that could occur from the SPOT project. The Fisheries Service provided no explanation for its assumption that this WCD scenario represents the largest volume of oil that could be spilled over the projects' 30-year lifetimes.

76.     Fourth, the SPOT WCD scenario relies on incorrect assumptions, and the Fisheries Service's reliance on the SPOT WCD results in an underestimate of the "worst-case" credible oil spill scenario from pipeline ruptures. The SPOT WCD scenario is based on the unsubstantiated notion that leak detection and operational shutdown would occur 30 minutes after the moment of rupture. However, the Fisheries Service provided no evidence supporting this assumption. Many oil spills go undetected for extended periods of time, leaking thousands of barrels of oil before any shutdown procedures are implemented. The *Deepwater Horizon* spill,

for example, went undetected for more than 24 hours because there were no visible traces of oil. Only a volume discrepancy on the order of hundreds of thousands of gallons was enough to alert the oil company. Notably, expert analysis demonstrates that increasing the shutdown time of the worst credible oil spill modeled for SPOT by even a half-hour would increase the discharge amount by more than 60,000 barrels of oil.

### 2. Failure to analyze other expected oil spills

77. The Fisheries Service's reliance on the SPOT WCD scenario is also flawed because solely analyzing one "worst-case credible discharge scenario" does not constitute an adequate oil spill risk analysis. The agency failed to analyze all other expected oil spills, including expected spills that vary in size and type.

78. First, the Fisheries Service failed entirely to analyze expected spills of different sizes. Other agencies such as the Bureau of Ocean Energy Management[5] and the Bureau of Land Management[6] routinely estimate the number of spills expected in different size categories, ranging from very small to catastrophic discharge events, to analyze oil spill risk. Recently, the District of Maryland found that the Fisheries Service's 2020 Gulf of Mexico oil and gas drilling biological opinion was arbitrary and capricious because it failed to consider the impacts from different-sized oil spills, including spills smaller in size than what the agency considered. *Sierra Club v. National Marine Fisheries Service*, 2024 WL 3860211, at *12–14.

79. Here, the Fisheries Service's focus on just the one SPOT WCD scenario fails to consider the likelihood and effects from spills of other sizes, including the possibility that more frequent spills of other sizes over both projects' lifetimes could severely impact ESA-listed

---

[5] The Bureau of Ocean Energy Management oversees offshore oil and gas leasing and development.
[6] The Bureau of Land Management oversees onshore oil and gas leasing and development.

species and critical habitats in the Gulf. An analysis of the frequences, probabilities, and locations of a comprehensive range of spill sizes is necessary to understand effects to species. For example, spills smaller than the SPOT WCD scenario may impact a smaller area each time they occur, but their higher frequency—particularly if they occur in or otherwise impact highly sensitive geographic areas—could cause sustained environmental harm that may have cumulative, long-lasting impacts to species and their habitats. Even if relatively small compared to the modeled SPOT WCD scenario, these more moderate-sized spills threaten the survival and recovery of ESA-listed species and inhibit recovery from past spills.

80.     Based on the government's own spill frequency calculations, a spill frequency expert estimated that up to 852 pipeline spills of varying sizes will occur over the lifetime of the SPOT project. Many of the spills from SPOT and GulfLink are likely to be significant. For example, based on a third-party consultant's risk assessment for the NEPA analysis for GulfLink, the expert calculated that two spills of more than 226,000 barrels are expected to occur over the lifetime of the GulfLink project alone. The Fisheries Service's failure to consider a range of spill numbers and sizes for both projects results in a flawed analysis of effects.

81.     Second, the Fisheries Service failed to analyze expected spills of different types. Oil spills can occur not just from pipelines but also from other sources, such as the buoy loading station or a VLCC. The agency failed entirely to consider oil spills from these other sources. Other agencies routinely consider spills from different sources (pipelines, platforms, etc.) in analyzing oil spill risk. As with the Fisheries Service's failure to consider a range of spill sizes, the agency's failure to consider a range of spills from different sources results in a flawed analysis of effects on species.

### 3.     Arbitrary estimate of impacts to species from oil spills

82.     Even if the Fisheries Service's reliance on the SPOT WCD scenario was

acceptable (which it is not), the agency's attempts to estimate impacts to species using the WCD scenario are arbitrary and capricious.

83.     First, the agency's scaling of the SPOT WCD scenario to the *Deepwater Horizon* spill to estimate impacts to species and habitats is arbitrary and contrary to science. The Fisheries Service noted that the SPOT WCD estimated for the proposed actions (687,602 barrels) is approximately 14% of the volume discharged during the *Deepwater Horizon* disaster (4.9 million barrels). From this, the agency arbitrarily assumed that effects to ESA-listed species from the two projects would be equal to 14% of the impacts from the *Deepwater Horizon* spill. In other words, based on this unscientific assessment, the Fisheries Service assumed that the SPOT WCD would cause 86% less damage than what occurred in the aftermath of *Deepwater Horizon*.

84.     The Fisheries Service failed to show that this approach to estimating impacts is scientifically sound or factually accurate. Oil spill volume is far from the only factor that influences impacts from spills to species. By solely focusing on oil spill volume in its effects analysis, the Fisheries Service ignored that the geographic location of a spill (e.g., species habitat and use) is a key factor in the type and extent of impacts that could result. The Fisheries Service also ignored that the distance from the coastline, the depth of the pipelines and other potential spill sources, along with ocean conditions such as winds and currents can heavily influence the extent and spread of an oil slick and subsea oil. Moreover, the Fisheries Service's approach ignored that ESA-listed species' populations have declined as a result of the *Deepwater Horizon* spill; thus, it is arbitrary for the agency to assume that impacts would be 14% of the *Deepwater Horizon* spill impacts when baseline populations have changed since that spill, remain unbalanced, or have not yet recovered to pre-*Deepwater Horizon* levels. The Fisheries Service's reliance on this arbitrary estimate of impacts results in flawed effects analyses, jeopardy

analyses, and critical habitat modification analyses.

85.    Second, in its jeopardy analysis, the Fisheries Service added another error to its calculation of effects on species: the agency incorrectly assumed the harm from the SPOT WCD scenario will be apportioned across the 30-year lifetime of the two deepwater oil export ports. For example, the Fisheries Service used the flawed method described above to find that the SPOT WCD scenario would result in 31,920 oil spill exposures and 12,544 deaths of the critically endangered Kemp's ridley sea turtle. Yet the Fisheries Service found these takes would not have measurable effects on the survival and recovery of the species, because the effects would be distributed "over a 30-year period."

86.    This calculation of effects to species is flawed because, as noted above, the SPOT WCD scenario was calculated to occur as a discrete, acute pulse. It is improper for the Fisheries Service to calculate effects from the SPOT WCD scenario as an average across the projects' 30-year timeline. By apportioning the effects throughout the length of the deepwater ports' lifetimes, rather than assessing the spill as a discrete pulse event, the Fisheries Service significantly downplayed the severity and significance of the potential for mass mortality and exposure that could occur to the species. This mischaracterization of spill impact dramatically underestimates the effects on the species, and their chances for survival and recovery.

87.    Third, the Fisheries Service's approach failed to account for injury to species and habitats from subsurface and invisible oil. The SPOT WCD scenario modeling only calculates the footprint of the oil spill based on "significant surface oiling." Like all pollution, oil spills are three-dimensional and extend far beyond what the naked eye can observe from one vantage point. Subsurface and invisible oil can be equally as toxic as visible surface oil to ESA-listed species, their prey, and their habitats. Research shows that quantification of the extent of harm

from oil spills requires a model that extends well beyond what is visible on the surface of the water or along a shoreline. Instead of conducting its own expert modeling and analysis, the Fisheries Service relied fully on the flawed SPOT WCD scenario to estimate impacts to species, thereby failing to account for the best available science.

### 4.    Inaccurate assessment of the environmental baseline

88.    In both its analyses of baseline conditions and effects on species, the Fisheries Service falsely claimed that "[t]he only spill greater than 10,000 barrels to occur in the last 20 years was the [*Deepwater Horizon*] spill in 2010." The Fisheries Service's failure to properly analyze the magnitude and frequency of spills greater than 10,000 barrels of oil contributes to its failure to properly assess the probability of spills and effects to protected species from such spills. It is against these baseline conditions that the Fisheries Service must evaluate effects from spills generated by SPOT and GulfLink.

89.    Reports from the Bureau of Ocean Energy Management state that there was a spill of 16,152 barrels in 2017 in the Gulf of Mexico caused by damage to a pipeline.[7] That same historical data showed that, in addition to *Deepwater Horizon*, there have been three "very large drilling-related blowouts" resulting in spills greater than or equal to 10,000 barrels. Those spills released 53,000 barrels, 65,000 barrels, and 80,000 barrels into the Gulf of Mexico. Additionally, Taylor Energy, the longest-running spill in U.S. history, has spilled crude oil into the Gulf for the past 18 years and is still ongoing. Clean up efforts from the Taylor Energy well site captured more than one million gallons of oil (equivalent to 23,000 barrels) over the span of three years, and more than five million gallons (119,000 barrels) may have released into Gulf waters over the

---

[7] Fisheries Service, *Appendices to the Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico* 46 (Mar. 13, 2020), https://repository.library.noaa.gov/view/noaa/23738/noaa23738DS2.pdf.

past nearly two decades.

90.     In addition, the Fisheries Service arbitrarily limited the timeline of its analysis of past spills to the previous 20 years, thereby failing to account for the three-million-barrel 1979 *Ixtoc I* Gulf oil spill. *Ixtoc*, which spilled more than 3.4 million barrels of crude oil into the Gulf, was the world's first massive offshore oil spill and is a historic catastrophic spill that must be acknowledged and accounted for in baseline conditions.

91.     The Fisheries Service's inaccurate description of the environmental baseline skews the BiOp's analyses of effects and jeopardy to species and whether the SPOT and GulfLink projects would cause adverse modification to critical habitat.

### B.     Rice's Whale

92.     The Fisheries Service's conclusion that the SPOT and GulfLink deepwater ports are not likely to adversely affect the Rice's whale is based on a flawed and incomplete analysis. The Fisheries Service ignored the best available science and improperly relied on an outdated and incorrect understanding of the Rice's whale habitat and voluntary measures to conclude that these highly imperiled whales would not be adversely affected by the projects.

93.     The Fisheries Service's analysis of the projects on the Rice's whale focused solely on whether there would be vessel traffic or oil spill impacts in the species' "core distribution area" in the northeastern Gulf of Mexico. This narrow view of the species' range fails to consider the most recent science on the Rice's whale. Contrary to previous scientific understanding, recent studies—including the Soldevilla (2022) study,[8] which the Fisheries Service cited in the BiOp—show that the Rice's whale is known to persistently occur outside its core distribution area in parts of the western Gulf, where vessel traffic and anticipated oil spills from SPOT and

---

[8] Soldevilla et al., *Rice's whales in the northwestern Gulf of Mexico: call variation and occurrence beyond the known core habitat*, 48 Endangered Species Rsch. 155 (2022).

GulfLink would occur (compare Figure 1 with Figures 2 and 3). The Fisheries Service's conclusion that adverse effects to the whale are unlikely because its occurrence in the project areas is "quite rare" contradicts the latest scientific evidence. The BiOp thus erred in discounting likely adverse effects to the Rice's whale outside the northeastern Gulf of Mexico.



**Figure 3.** Figure 13 in the BiOp depicting the probability of surface oiling from the WCD for pipeline rupture from the SPOT project (reproduced from the SPOT NEPA analysis).

94.     Although the Fisheries Service cited to the recent Soldevilla (2022) study, it simply ignored the conclusion that the whales "persistently occur" outside of the northeastern Gulf, with indications of the species regular presence in the western Gulf of Mexico, with sightings in waters off the coast of Texas.

95.     Based partly on the Soldevilla (2022) study, in August 2023, the Fisheries Service proposed to designate critical habitat for the Rice's whale, encompassing waters from the 100- to 400-meter isobaths throughout the Gulf of Mexico (including the western Gulf). 88 Fed. Reg. at 47461; *see* Figure 1.

96.     The BiOp's limited consideration of Rice's whale habitat in assessing effects on

this critically endangered species contradicts the best available science and is thus arbitrary.

97.     The Fisheries Service also assumed that project-related vessels are unlikely to adversely impact Rice's whales because the agency plans to provide crude oil carrier operators with information about the agency's voluntary vessel strike avoidance measures. The agency cannot rely on third-party operators to comply with voluntary measures that may or may not be implemented to discount impacts to species, particularly the impacts to one of the most critically endangered species in the world.

98.     The BiOp also failed to adequately analyze impacts from noise associated with the two projects. Rice's whales produce and receive calls in order to communicate with one another, navigate, and identify food and danger. Anthropogenic noise—from vessels, pile driving, and more—disrupts Rice's whale vital behaviors such as feeding and breeding; and chronic stress associated with noise exposure impairs individual health and fitness.  Baleen whales exposed to chronic noise are known to undergo changes in physiology, foraging, and vocal behavior. A study available at the time of the BiOp's release observed that, on numerous occasions, Rice's whales stopped producing calls when a survey vessel began approaching them. They did not start calling again until the vessel had turned away or passed their last known location, remaining silent for up to an hour.

99.     The BiOp overlooks this best available science by concluding that vessel noise associated with the projects would not adversely affect any ESA-listed whale species. This characterization ignores the reality of the status of the Rice's whale: the health of every individual of the species is vitally important, especially since the loss of even one single whale could result in the extinction of this species. In determining whether an action is likely to jeopardize the continued existence of listed species, the Fisheries Service must add the aggregate

effects of the action and cumulative effects to the environmental baseline of the species. The agency did not do so here.

**C.     Corals**

100.     The Fisheries Service concluded that the projects are not likely to adversely affect four ESA-listed coral species: boulder star coral, elkhorn coral, lobed star coral, and mountainous star coral.

101.     In reaching this conclusion, the Fisheries Service relied on the fact that the Flower Garden Banks National Marine Sanctuary—where these corals can be found—is approximately 90 miles away from the projects.

102.     In fact, the SPOT deepwater port is sited just 46 miles from the Sanctuary, and the GulfLink deepwater port is just 47 miles from the Sanctuary.

103.     Moreover, the *Deepwater Horizon* oil spill released oil that spread over 43,300 square miles. And the Fisheries Service ignored that VLCCs associated with the projects will be transporting substantial amounts of oil out of the Gulf of Mexico and through other habitat areas for these corals. The BiOp fails to consider how oil spilled from the deepwater port facilities or these vessels might be transported via ocean currents and storms and affect these coral species.

104.     The Fisheries Service also dismissed the effects of spilled oil on corals by claiming that, as benthic species (i.e., those that are live on the seafloor), corals are "less susceptible to oiling than animals that utilize the water column and surface for feeding, breathing, and swimming." This conclusion is inconsistent with studies following the *Deepwater Horizon* spill demonstrating the extensive harm the spill caused to both shallow-water and deep-sea corals in the Gulf of Mexico. Indeed, the agency has elsewhere acknowledged the numerous harms to corals from oil spills, including that oil spills can kill corals, and that chronic oil toxicity impedes coral reproduction, growth, behavior, and development. And a scientific study

led by the Fisheries Service discredited the long-held belief that coral reefs do not suffer acute toxicity effects from oil floating over them.

105.    The Fisheries Service also entirely ignored how the projects could affect three other ESA-listed species of corals: the rough cactus coral, pillar coral, and staghorn coral. These species can be found in the Gulf of Mexico and in areas through which the projects' VLCCs will travel and are therefore at risk of impact from oil spills associated with the projects. The Fisheries Service entirely failed to consider effects on these three coral species.

**D.    Sea Turtles**

106.    Although the Fisheries Service found that oil spills from the two projects are likely to adversely affect the ESA-listed sea turtle species in the Gulf of Mexico, the Fisheries Service claimed in the BiOp that impacts from vessels are unlikely to affect ESA-listed sea turtles. The agency acknowledged that sea turtles are injured and killed if struck by vessels and that the SPOT and GulfLink projects would increase vessel traffic in the Gulf of Mexico. Yet the agency claimed that sea turtles would not be killed or injured from project-related vessel strikes due to "the species' mobility and the slow speeds at which vessels are required to operate in accordance with the Protected Species Construction Conditions and Vessel Strike Avoidance Measures."

107.    The Fisheries Service's reliance on these conditions and measures to find no adverse effects is improper. The Construction Conditions (which the Fisheries Service failed to discuss in the BiOp) only apply during construction and do not protect species from vessel strikes during the 30-year duration of the licensed export operations. Further, the Vessel Strike Avoidance Measures are entirely voluntary. The BiOp states that the companies for the SPOT and GulfLink projects have agreed to adhere to these measures "throughout all in-water construction and decommissioning activities," but there is no indication that the companies

would adhere to these measures during the decades of deepwater port operations, or that the agency can and will enforce those measures if the company or individual operators choose not to implement them. Voluntary measures that lack enforceability and oversight, and that will not apply during the projects' 30-year duration are an insufficient measure for assessing, and discounting, the projects' impacts on species. Reliance on these measures to conclude injury from the projects is extremely unlikely is thus plain error.

108.    The Fisheries Service's finding of no adverse effects on sea turtles from vessel strikes is also inconsistent with the Fisheries Service's own biological opinion governing federally authorized oil and gas program activities in the Gulf of Mexico. The BiOp here claims that sea turtle injury and death from project-related vessel strikes are "extremely unlikely" because sea turtles can swim away from oncoming vessels and because the voluntary vessel strike avoidance measures would be in place. Yet, in the oil and gas drilling biological opinion, the Fisheries Service found that thousands of sea turtles would be killed by vessel strikes from drilling activities each year—where the same voluntary avoidance measures apply. The Fisheries Service did not explain how it can conclude that sea turtles would not be killed or injured by SPOT and GulfLink-related vessels in particular, when it concluded in the other biological opinion that these species are killed and injured by other vessels.

### E.    Aggregate Effects

109.    The BiOp defines the proposed action as the issuance of permits for the construction, operation and decommissioning of two deep water port projects within Brazoria County, Texas: SPOT and GulfLink. However, in evaluating the effects of the action on ESA-listed species and designated critical habitats, the Fisheries Service only considered the impacts of each project in isolation, without considering the combined effects of oil spills, noise pollution, and vessel strikes from each project. The combined effects will indeed be much larger

in scale and scope. For example, the two projects together are estimated to load as many as 545 massive VLCCs (or similar-sized carriers) per year, which will transit sensitive habitats throughout the Gulf.

110.     The BiOp also fails to properly consider the effects of these projects in light of all the other threats and incidental take facing ESA-listed species in the Gulf of Mexico, including from oil and gas development in state and federal waters. Such failure is particularly glaring considering the Fisheries Service determined in its 2020 Gulf of Mexico oil and gas drilling biological opinion that status quo oil and gas drilling activities: (1) will likely jeopardize the continued existence of Rice's whales (one of the few jeopardy biological opinions the agency has ever issued), (2) will kill 13,000 sea turtles every year by vessel strikes (including 2,100 Kemp's ridley sea turtles), and (3) will kill or harm 21,500 sea turtles from oil spills each year, in addition to causing numerous other harms to the same species affected by SPOT and GulfLink.

## F.     Incidental Take Statement

111.     The BiOp contains what purports to be an incidental take statement. But the incidental take statement lacks the protections that the Fisheries Service acknowledged such a statement is supposed to provide, including "a metric against which [the Fisheries Service] can measure whether or not reinitiation of consultation is required" and measures "to minimize the impact of such incidental take."

112.     The incidental take statement claims that no adverse effects of green, Kemp's ridley, leatherback, loggerhead, and hawksbill turtles is expected from the construction, operation, and decommissioning of the projects, except from oil spills. This ignores take of these ESA-listed species that the available information indicates is reasonably certain to occur from other threats, including the take that is reasonably certain to occur from vessel strikes.

113.     Moreover, despite determining that take of some ESA-listed species would occur

from oil spills, the incidental take statement does not specify the amount or extent of oil spill

take. Instead, it uses a surrogate that is based solely on the quantity of oil spilled. Specifically,

the Fisheries Service stated that it will keep track of any oil spills from the projects and calculate

the total every five years. If the total amount of oil spilled over a five-year period exceeds

114,600 barrels (1/6 of the amount anticipated under the WCD scenario), reinitiation of

consultation will be required. This surrogate is improper as it is based on the agency's inadequate

oil spill risk analysis, as described above. The surrogate is also improper as it only considers the

*amount* of oil spilled, not *where* it spills, and that more animals could be taken if a spill occurs in

or otherwise affects important habitat areas. The surrogate is also improper because it arbitrarily

sets a five-year timeline for calculating and evaluating quantities of oil spilled: the agency

ignores that oil spills exceeding 114,600 barrels could reasonably occur in less than the 5-year

timeframe. For example, an oil spill frequency expert estimated that oil spill volumes from

GulfLink alone are expected to exceed between 30,291 and 70,000 barrels annually and that

there is over a 50% chance each year of a spill from GulfLink alone exceeding 113,500 barrels.

The five-year assessment timeline will likely fail to properly trigger reinitiation of consultation

as required under the ESA.

114.    The incidental take statement also does not specify any reasonable or prudent

measures or terms and conditions to minimize the impact of that take, instead pointing to

unidentified "safety regulations, criteria and protocols that are currently in place to prevent,

minimize, and mitigate any oil spills from the proposed projects."

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION – THE BIOLOGICAL OPINION'S ANALYSES ARE ARBITRARY AND CAPRICIOUS AND CONTRARY TO THE BEST AVAILABLE SCIENCE, IN VIOLATION OF THE APA AND ESA

115.    The allegations made in paragraphs 1–114 are realleged and incorporated by this

reference.

116.    Section 7 of the ESA requires that, in formal consultation, the Fisheries Service, as the expert wildlife agency, must review all relevant information and issue a biological opinion evaluating the action's effects on the listed species and critical habitat and make determinations on jeopardy and adverse modification. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)–(h). This includes evaluating the current status and environmental baseline of affected species and critical habitats, assessing the effects of the action and cumulative effects on those species and habitats, and analyzing whether the effects of the action, when added to the environmental baseline together with any cumulative effects, is likely to jeopardize the continued existence of the species or adversely modify their critical habitats. 50 C.F.R. § 402.14(g). Such consultations must use the "best scientific and commercial data available." *Id.*; 16 U.S.C. § 1536(a)(2).

117.    The Fisheries Service's BiOp is a final agency action as defined by the APA, for which there is no other adequate remedy in a court.

118.    The Fisheries Service's analyses of the effects on species and the likelihood of jeopardy and adverse modification from oil spills are arbitrary and capricious and contrary to law for several reasons. First, the Service improperly and arbitrarily relied on a third-party consultant's WCD estimate from a pipeline rupture at the SPOT port to analyze impacts from all oil spills from both projects over the 30-year lifetimes of the projects, even though that WCD scenario only considered an acute spill from one project and focused only on a spill from pipeline rupture. Moreover, the WCD scenario is based on inaccurate assumptions that operators would shut down a pipeline leak 30 minutes from the time of rupture. Second, the Service failed to consider other likely spills of different sizes and from different sources. Third, the Fisheries Service improperly estimated impacts to species from spills by improperly using scaled volumes

from the WCD, incorrectly diluting effects from the WCD scenario over 30 years, and failing to account for impacts from subsurface or invisible oil. Finally, the Fisheries Service used an improper baseline to evaluate harm from oil spills. As a result, the Fisheries Service failed to sufficiently and accurately consider the effects of oil spills in analyzing whether the proposed action will jeopardize the continued existence of ESA-listed species or adversely modify designated critical habitat in the Gulf.

119.    The Fisheries Service arbitrarily concluded that SPOT and GulfLink are not likely to adversely affect the critically endangered Rice's whale. In evaluating the effects of the projects on Rice's whales, the Fisheries Service ignored and/or misinterpreted scientific information indicating that Rice's whales are "persistently" found in the western and central Gulf of Mexico, and are therefore at risk of oil spill, vessel strikes, and noise pollution from the projects. The Fisheries Service's determination that SPOT and GulfLink are not likely to adversely affect Rice's whales is based on the agency's irrational conclusion that the whale's presence in the western and central Gulf is "quite rare." The Fisheries Service also arbitrarily relied on voluntary mitigation measures to dismiss the risk of vessel strikes to this critically endangered species. The Fisheries Service also ignored best available science regarding impacts to Rice's whales from vessel noise.

120.    The Fisheries Service's conclusion that the projects are not likely to adversely affect ESA-listed corals is arbitrary. In evaluating the effects of the projects on boulder star coral, elkhorn coral, lobed star coral, and mountainous star coral, the Fisheries Service made false claims regarding the proximity of the deepwater port facilities to coral habitat, and ignored how these corals could be exposed to oil spills from the projects (including from spills from the deepwater port facilities and VLCCs while in transit) and the harms that could result to these

corals in the event of an oil spill. The Fisheries Service also entirely failed to consider the effects of the projects on the rough cactus coral, pillar coral, and staghorn coral, despite the fact that VLCCs from the projects will travel through areas where these corals are found, exposing them to risk of oil spills.

121.    The Fisheries Service's conclusions that the proposed action will not adversely affect or jeopardize the continued existence of the Kemp's ridley sea turtle, loggerhead sea turtle, leatherback sea turtle, or hawksbill sea turtle are not based on rational scientific analyses, nor do they consider all relevant factors or use the best available science. In addition, the Fisheries Service's reliance on mitigation measures to conclude the projects will not jeopardize ESA-listed sea turtles is improper. When a biological opinion's no-jeopardy conclusion relies on mitigation measures, those measures as well as the benefits they are intended to provide must be reasonably specific, certain to occur, capable of implementation, and enforceable. Here, however, the Fisheries Service impermissibly concluded that vessel strikes of ESA-listed sea turtles are unlikely by relying on voluntary mitigation measures that are both not certain to occur and unenforceable.

122.    The Fisheries Service also failed to determine whether the aggregate effects of the actions, in combination with the environmental baseline and cumulative effects, will jeopardize ESA-listed species or adversely modify or destroy designated critical habitats. The Fisheries Service, for example, failed to consider the aggregate effects of both SPOT and GulfLink, or the effects of these projects in light of the numerous threats and incidental takes ESA-listed species in the Gulf of Mexico are already facing, including from oil and gas drilling activities.

123.    The Fisheries Service's BiOp is thus arbitrary, capricious, an abuse of discretion, and not in accordance with Section 7 of the ESA, in violation of the APA. 5 U.S.C. § 706(2)(A).

### SECOND CAUSE OF ACTION – THE INCIDENTAL TAKE STATEMENT IS ARBITRARY AND CAPRICIOUS AND CONTRARY TO THE ESA, IN VIOLATION OF THE APA AND ESA

124.    The allegations made in paragraphs 1–123 are realleged and incorporated by this reference.

125.    Section 7(b)(4) of the ESA requires the Fisheries Service to issue an incidental take statement whenever a proposed federal agency action will not jeopardize a protected species but is reasonably certain to result in incidental take of any members of the species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(g)(7).

126.    The incidental take statement must "specif[y] the impact", *i.e.*, the amount or extent, of such incidental taking on the species. 50 C.F.R. § 402.14(i)(1)(i); *see also* 16 U.S.C. § 1536(b)(4)(C)(i). Where the agency establishes that it cannot numerically quantify take, the statement may employ a "surrogate" to express the amount of take, but the surrogate must include "a clear standard for determining when the level of anticipated take has been exceeded." 50 C.F.R. § 402.14(i)(1)(i). If the amount of specified take is exceeded, the action agency "must reinitiate consultation immediately" with the Fisheries Service. *Id.* § 402.14(i)(5).

127.    An incidental take statement must also include any "reasonable and prudent measures" that the Fisheries Service considers necessary or appropriate to minimize such impact; the "terms and conditions" (including, but not limited to, reporting requirements) that must be complied with by the action agency to implement those measures. 16 U.S.C. § 1536(b)(4)(C)(ii)–(iv); 50 C.F.R. § 402.14(i)(1)(ii)–(iv), (i)(4).

128.    The BiOp's incidental take statement says that the Fisheries Service determined that take of ESA-listed species, including listed sea turtles, would occur from the projects via oil spills. However, the incidental take statement fails to specify a numerical amount or extent of that take and instead includes an improper surrogate. The agency used quantity of oil spilled as a

42

surrogate, but the surrogate is based on an inadequate oil spill risk analysis, considers only the amount of oil spilled (not the location of the spill), and sets an arbitrary five-year timeframe for spill assessment that will fail to properly trigger reinitiation of consultation.

129.    The BiOp's incidental take statement fails to include any reasonable and prudent measures or terms and conditions to minimize the take of ESA-listed species associated with oil spills resulting from the proposed actions.

130.    The BiOp's incidental take statement fails to account for and minimize take of listed sea turtles that is reasonably certain to occur from vessel strikes.

131.    The BiOp's incidental take statement allows the action agencies to exceed the amount of specified annual take without reinitiating consultation, contrary to 50 C.F.R. § 402.14(i)(4).

132.    The Fisheries Service's inclusion of an inadequate incidental take statement in the BiOp is arbitrary, capricious, an abuse of discretion, and not in accordance with Section 7 of the ESA or its implementing regulations, in violation of the APA. 5 U.S.C. § 706(2)(A).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that the BiOp and incidental take statement violate the ESA, its implementing regulations, and the APA;

2.    Vacate and remand the BiOp;

3.    Maintain jurisdiction over this action until the Fisheries Service is in compliance with the ESA, APA, and every order of this Court;

4.    Award Plaintiffs their costs and reasonable attorney fees pursuant to 5 U.S.C. § 552(a)(4)(E) or 28 U.S.C. § 2412; and

5.      Grant Plaintiffs such further and additional relief as the Court may deem just and

proper.

Respectfully submitted this 18th day of September, 2024.

/s/ Christopher D. Eaton
Christopher D. Eaton (D. Md. Bar 21544)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
ceaton@earthjustice.org

Rumela Roy (*pro hac vice* forthcoming)
EARTHJUSTICE
633 17th Street, Suite 1600
Denver, CO 80202
303-623-9466 Telephone
415-217-2040 Fax
rroy@earthjustice.org

Brettny Hardy (*pro hac vice* forthcoming)
EARTHJUSTICE
50 California Street, Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
bhardy@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf and Texas
Campaign for the Environment*

/s/ Kristen Monsell
Kristen Monsell (*pro hac vice* forthcoming)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
510-844-7137 Telephone
510-844-7150 Fax
kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological
Diversity*

_/s/ Devorah Ancel_

Devorah Ancel (*pro hac vice* forthcoming)
SIERRA CLUB
PO Box 4998
Austin, TX 78765
415-845-7847 Telephone
303-449-6520 Fax
devorah.ancel@sierraclub.org

*Attorney for Plaintiffs Sierra Club and Turtle Island Restoration Network*