UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

SIERRA CLUB,
CENTER FOR BIOLOGICAL DIVERSITY,
HEALTHY GULF,
TEXAS CAMPAIGN FOR THE
ENVIRONMENT and TURTLE ISLAND
RESTORATION NETWORK,

       Plaintiffs,

       v.

NATIONAL MARINE FISHERIES
SERVICE and
LAURA GRIMM,
*in her official capacity as Chief of Staff of the*
*National Oceanic and Atmospheric*
*Administration, performing the duties of the*
*Under Secretary of Commerce for Oceans and*
*Atmosphere and the Administrator of the*
*National Oceanic and Atmospheric*
*Administration,*

       Defendants.

Civil Action No. 24-2699-TDC

**MEMORANDUM OPINION**

Plaintiffs Sierra Club, Center for Biological Diversity, Healthy Gulf, Texas Campaign for

the Environment, and Turtle Island Restoration Network have filed this civil action against

Defendants the National Marine Fisheries Service ("NMFS"), an office within the United States

Department of Commerce's National Oceanic and Atmospheric Administration ("NOAA"), and

NOAA Chief of Staff Laura Grimm, in which they allege that an NMFS biological opinion

addressing the effects on federally protected species and critical habitats that would result from

the construction and operation of two deepwater crude oil export terminals in the Gulf of Mexico

violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. Defendants have filed a Motion to Dismiss or, in the Alternative, to Transfer, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be DENIED.

## BACKGROUND

This case arises out of the proposed construction and operation of two deepwater crude oil export terminals in the Gulf of Mexico[1]: the Sea Port Oil Terminal ("SPOT") and the Texas GulfLink Deepwater Port Project ("GulfLink"). If constructed, these terminals will facilitate "the transportation of crude oil for export to the global market" by receiving crude oil from a combination of onshore and offshore pipelines and loading it onto large tankers for shipment by sea. SPOT/Gulflink Biological Opinion ("BiOp") at 12, 31, Opp'n Ex. 1, ECF No. 38-2.

### I.    Statutory and Regulatory Framework

To initiate such projects, developers of deepwater ports like SPOT and GulfLink are required to seek licenses from the United States Secretary of Transportation pursuant to the Deepwater Port Act ("DPA"), 33 U.S.C. §§ 1501–1523. *See* 33 U.S.C. § 1503(a), (b). The authority to issue such licenses has been delegated to the United States Maritime Administration ("MARAD"), a component agency of the United States Department of Transportation ("DOT"), in coordination with the United States Coast Guard ("the Coast Guard"), which was formerly part of DOT and retained the authorities delegated to it by the Secretary of Transportation upon its transfer to the United States Department of Homeland Security. *See* 49 C.F.R. § 1.93(h)(1)–(2); 6 U.S.C. § 468(b).

---

[1]   The Court uses the name for this body of water used by the parties in their pleadings and briefs.

The licensing of a deepwater port is conditioned on the satisfaction of several requirements, including compliance with various environmental statutes and regulations, two of which are relevant here. First, MARAD and the Coast Guard must comply with the requirements of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4331–4336e. *See* 33 U.S.C. § 1504(f). Under NEPA, "all agencies of the Federal Government" must "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on," among other considerations, "the reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C). Moreover, the agency authoring this environmental impact statement ("EIS") must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* In this instance, the Coast Guard was responsible for the preparation of the relevant EISs on behalf of DOT and MARAD.

Second, MARAD and the Coast Guard must comply with the ESA. The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). To those ends, Section 7 of the ESA requires the listing of species as endangered or threatened based on enumerated statutory factors, as well as the designation of critical habitat for endangered and threatened species to protect those areas essential to those species' conservation. *See* 16 U.S.C. § 1533(a)(1), (3). The ESA further requires each federal agency to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such

3

species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2). In turn, the ESA mandates a consultation process under which any agency seeking to undertake an agency action ("the acting agency") with potential implications for an endangered or threatened species or a critical habitat must confer with the agency with expertise relating to the species ("the consulting agency") "on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed" as endangered or threatened under the ESA "or result in the destruction or adverse modification of critical habitat proposed to be designated for such species." 16 U.S.C. § 1536(a)(4). As relevant here, the NMFS acts as the consulting agency with respect to most marine species. *See* 50 C.F.R. § 402.01(b).

The consultation process requires the consulting agency, among other requirements, to review all relevant information provided by the acting agency or that is otherwise available, evaluate the current status and environmental baseline of any listed species or critical habitat, evaluate the effects of the proposed agency action and cumulative effects on any listed species or critical habitat, formulate an opinion as to "whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," and discuss these findings with the acting agency. 50 C.F.R. § 402.14(g). At the end of the consultation process, the consulting agency issues a biological opinion ("BiOp") that provides an assessment of the effects of the agency action on endangered or threatened species and on critical habitats. *See* 16 U.S.C. § 1536(b)(3)(A). If the consulting agency concludes that the proposed agency action is likely to jeopardize a listed species or result in adverse modification of its critical habitat, it must propose reasonable and prudent alternatives, if available, to implement the agency action without these adverse impacts. *See id.*; 50 C.F.R. § 402.14(h)(2).

4

In addition, Section 9 of the ESA prohibits "any person" from acting to "take" an endangered species, 16 U.S.C. § 1538(a)(1)(B), a term defined to mean to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect," 16 U.S.C. § 1532(19). In cases in which the consulting agency determines that a proposed agency action will result in such a taking of a listed species, it must include in the BiOp an incidental take statement ("ITS") that specifies "the impact of incidental taking as the amount or extent of such taking" as well as "reasonable and prudent measures" considered to be "necessary or appropriate to minimize such impact of incidental taking on the species." 50 C.F.R. § 402.14(i).

## II.    The Deepwater Crude Oil Export Terminal License Applications

In January 2019, a license application for SPOT was submitted to MARAD. If constructed as planned, SPOT would be located "approximately 30 nautical miles off the coast of Brazoria County, Texas" and would be the "largest crude [oil] export facility ever built in U.S. waters." Am. Compl. ¶ 48, ECF No. 34. In May 2019, a license application for GulfLink was submitted to MARAD. If constructed as planned, GulfLink would be located "only seven nautical miles from the SPOT terminal, and about 27 miles off Brazoria County, Texas" and would constitute "another massive deepwater crude oil export facility in U.S. federal waters." *Id.* ¶ 51.

At the same time, the Gulf of Mexico is "home to some of the most productive and biodiverse habitats in the United States." *Id.* ¶ 41. Among these habitats live more than 30 marine species identified under the ESA as endangered or threatened, such as the "critically endangered" Rice's whale and the Kemp's ridley sea turtle, which is "the most endangered sea turtle in the world." *Id.* ¶ 2. Accordingly, on January 13, 2020, the Coast Guard sent to the NMFS a written request for formal consultation relating to the license application for SPOT. The Coast Guard sent a similar request relating to the license application for GulfLink.

5

On November 9, 2022, the NMFS issued a BiOp ("the SPOT/GulfLink BiOp" or "the BiOp") in which it projected the joint effect of SPOT and GulfLink on various endangered and threatened species and critical habitats. The NMFS concluded that the proposed actions are "not likely to adversely affect" Rice's whales and ESA-listed corals, but they are "likely to adversely affect, but are not likely to jeopardize the continued existence of," sperm whales; green, Kemp's ridley, leatherback, loggerhead, and hawksbill turtles; giant manta rays; and oceanic whitetip sharks. BiOp at 1–2. The NMFS also concluded that the proposed actions are "likely to adversely affect, but are not likely to result in the destruction or adverse modification of designated critical habitat for," loggerhead sea turtles. *Id.* at 2. Finally, with the SPOT/GulfLink BiOp, the NMFS provided an ITS in which it described "reasonable and prudent measures NMFS considers necessary or appropriate to minimize the impact of incidental take associated with these actions" and specified "terms and conditions, including monitoring and reporting requirements," with which the Coast Guard, MARAD, and the license applicants "must comply to carry out the reasonable and prudent measures." *Id.*

On November 21, 2022, MARAD issued a Record of Decision in which it granted a DPA license for SPOT. On January 19, 2023, Citizens for Clean Air and Clean Water in Brazoria County, Texas Campaign for the Environment, Turtle Island Restoration Network, Sierra Club, and Center for Biological Diversity filed a petition for review of this decision in the United States Court of Appeals for the Fifth Circuit pursuant to 33 U.S.C. § 1516, which provides that "[a]ny person suffering legal wrong, or who is adversely affected or aggrieved" by such a decision may "seek judicial review of such decision in the United States Court of Appeals for the circuit within which the nearest adjacent coastal State is located." 33 U.S.C. § 1516. On April 4, 2024, the Fifth Circuit denied the petition for review in *Citizens for Clean Air & Clean Water in Brazoria County*

*v. United States Dep't of Transportation* ("*Citizens for Clean Air*"), 98 F.4th 178, 198 (5th Cir. 2024). In April 2024, MARAD issued a conditioned license for the construction and operation of SPOT.

On February 14, 2025, MARAD issued a Record of Decision in which it granted a DPA license for GulfLink. On April 15, 2025, a single environmental organization, Citizens for Clean Air and Water in Brazoria County, filed a petition for review of this decision in the Fifth Circuit. That petition remains pending.

## III.    Procedural History

On September 18, 2024, Plaintiffs filed the original Complaint in this case. On December 16, 2024, Plaintiffs filed the presently operative Amended Complaint in which they assert two causes of action against Defendants. In Count 1, Plaintiffs assert that the NMFS's issuance of the SPOT/GulfLink BiOp was arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA, all in violation of the APA, 5 U.S.C. § 706(2)(A). In Count 2, Plaintiffs assert that the NMFS's issuance of the ITS incorporated into the SPOT/GulfLink BiOp was arbitrary, capricious, an abuse of discretion, and not in accordance with the ESA, all in violation of the APA.

## DISCUSSION

In the Motion, Defendants seek dismissal for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for a failure to state a claim pursuant to Rule 12(b)(6). In the alternative, Defendants seek the transfer of this case either to the Fifth Circuit or to the United States District Court for the Southern District of Texas pursuant to 28 U.S.C. § 1404.

## I.    Subject Matter Jurisdiction

Defendants assert that this Court lacks subject matter jurisdiction over this case on the grounds that (1) pursuant to 33 U.S.C. § 1516, the Fifth Circuit has exclusive jurisdiction over this case; and (2) Plaintiffs lack standing to assert their claims relating to GulfLink.

### A.    Legal Standard

It is the plaintiff's burden to show that subject matter jurisdiction exists. *Evans v. B.F. Perkins Co., Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999). Rule 12(b)(1) allows a defendant to move for dismissal when it believes that the plaintiff has failed to make that showing. When a defendant asserts that the plaintiff has failed to allege facts sufficient to establish subject matter jurisdiction, the allegations in the complaint are assumed to be true under the same standard as in a Rule 12(b)(6) motion, and "the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). Generally, on a Rule 12(b)(1) motion, a court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns*, 585 F.3d at 192.

### B.    Exclusive Jurisdiction

The United States Supreme Court has held that a BiOp constitutes a final agency action generally subject to judicial review under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178–79 (1997). In the Motion, however, Defendants argue that this Court cannot review Plaintiffs' challenge to the SPOT/GulfLink BiOp because it effectively seeks "to challenge the SPOT and GulfLink licensing decisions," Mot. at 8, ECF No. 35-1, and the DPA already provides for review of such decisions in a United States Court of Appeals pursuant to 33 U.S.C. 1516, which provides in relevant part that:

8

Any person suffering legal wrong, or who is adversely affected or aggrieved by the Secretary's decision to issue, transfer, modify, renew, suspend, or revoke a license may, not later than 60 days after any such decision is made, seek judicial review of such decision in the United States Court of Appeals for the circuit within which the nearest adjacent coastal State is located.

33 U.S.C. § 1516. Defendants argue that because the APA provides that judicial review of a "final agency action" is available only when "there is no other adequate remedy in a court," 5 U.S.C. § 704, and where "Congress has provided special and adequate judicial review procedures" of such licensing decisions through 33 U.S.C. § 1516, the latter remedy is "exclusive." Mot. at 8.

Notably, the United States Court of Appeals for the Fourth Circuit considered an almost identical statutory argument in *Dow AgroSciences LLC v. National Marine Fisheries Service* ("*Dow*"), 637 F.3d 259 (4th Cir. 2011). In *Dow*, the Fourth Circuit examined an APA challenge to a BiOp issued by the NMFS following formal consultation with the United States Environmental Protection Agency ("EPA"). *Id.* at 260–61. The EPA, which constituted the acting agency in *Dow*, had requested the BiOp as part of its decisionmaking process for "reregistering for sale and use the insecticides chlorpyrifos, diazinon, and malathion" pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136n, and the NMFS concluded in the BiOp that the insecticides would "destroy or harm Pacific salmonids and their habitat." *Dow*, 637 F.3d at 260. Before the EPA could act on the BiOp and issue a final order on whether to reregister the insecticides, however, the plaintiffs, manufacturers that produced the insecticides at issue, filed a lawsuit in federal district court pursuant to the APA in which they alleged that the BiOp had ignored "superior scientific studies submitted by them and supported by the EPA," and that the NMFS had "accelerated the timeline for issuing the final BiOp, causing the agency not to address material comments submitted in response to the draft BiOp." *Id.* at 263–64. The district court dismissed the case both on the grounds that the BiOP was not a final agency action reviewable

9

under the APA because the EPA has not yet issued a final order on whether to reregister the insecticides and because, at that point, the BiOP and final order would be subject to "judicial review in a court of appeals" as authorized by FIFRA. *Id.* at 260. Like the DPA, FIFRA contained a special judicial review provision, which provided in relevant part:

> In the case of actual controversy as to the validity of any order issued by the Administrator following a public hearing, any person who will be adversely affected by such order and who had been a party to the proceedings may obtain judicial review by filing in the United States court of appeals for the circuit wherein such person resides or has a place of business, within 60 days after the entry of such order, a petition praying that the order be set aside in whole or in part. . . . Upon the filing of such petition the court shall have exclusive jurisdiction to affirm or set aside the order complained of in whole or in part. . . . The judgment of the court affirming or setting aside, in whole or in part, any order under this section shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

7 U.S.C. § 136n(b).

On appeal, like Defendants here, the NMFS argued that "judicial review now in the district court is not authorized by the APA" because "there will be adequate review of the BiOp by the court of appeals on review of any decision by the EPA to cancel or alter the registrations as provided by FIFRA's special statutory jurisdictional provision" in 7 U.S.C. § 136n. *Dow*, 637 F.3d at 264. The Fourth Circuit, however, rejected this argument on the grounds that, because 7 U.S.C. § 136n(b) references only orders "issued *by the Administrator*" of "[the EPA] following a public hearing," and a BiOp is "not an 'order issued by the Administrator . . . ,'" the plain language does not provide *statutory* support for an argument that a BiOp issued *by the Fisheries Service* can be subject to judicial review as part of" the EPA Administrator's decision. *Dow*, 637 F.3d at 265.

Here, *Dow* effectively disposes of Defendants' argument. Like the statutory language at issue in *Dow*, the DPA plainly authorizes judicial review solely over decisions rendered by the Secretary of Transportation, whose authority under the DPA has been delegated to MARAD. *See*

10

33 U.S.C. § 1516 (stating that "[a]ny person . . . who is adversely affected or aggrieved by *the Secretary's decision* to issue . . . a license" may seek judicial review in "the United States Court of Appeals" (emphasis added)). Just as the BiOp issued by the NMFS in *Dow* was not subject to the FIFRA judicial review provision because it was not an order issued by the EPA Administrator, the present BiOp, also issued by the NMFS, which is a part of the Department of Commerce and NOAA, is not an order issued by the Secretary of Transportation and is not subject to judicial review by a United States Court of Appeals pursuant to 33 U.S.C. § 1516. *See Dow*, 637 F.3d at 265. In turn, as in *Dow*, Defendants' argument that Plaintiffs' APA claim cannot be reviewed because § 1516 provides another "adequate remedy in a court" necessarily fails. *See id.*

Defendants further argue that 33 U.S.C. § 1516 is "an exclusive judicial review provision" and thus applies to "all issues inhering in the controversy," including the BiOp. Mot. at 9 (quoting *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958)). In so doing, Defendants rely primarily on *City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958), in which the Supreme Court considered claims arising out of the proposed construction of a power plant by the City of Tacoma, a municipality in the State of Washington, "in accordance with a license issued by the Federal Power Commission under the Federal Power Act." *Id.* at 322–23. The construction of the power plant, however, would require the taking of a fish hatchery owned and operated by the State of Washington. *See id.* at 323. When the Federal Power Commission ("FPC" or "the Commission") nevertheless granted the license, the State filed a petition for review in the United States Court of Appeals for the Ninth Circuit pursuant to a provision of the Federal Power Act that authorized review of "an order issued by the Commission," 16 U.S.C. § 825*l*, by a United States Court of Appeals. *Taxpayers of Tacoma*, 357 U.S. at 327–28. The Ninth Circuit rejected the State's argument that the license should not have been granted because the construction of the

11

power plant violated various state laws and affirmed. *See id.* While the petition for review was pending, however, the State sought and received an injunction from a state court, a ruling which was then affirmed by the Washington Supreme Court on the grounds that the City could not use a license issued by the FPC to condemn state-owned and state-controlled property. *See id.* at 328, 332–33.

When the United States Supreme Court granted a petition for a writ of certiorari to review the Washington Supreme Court's ruling, the City argued that this issue had already been decided by the Ninth Circuit and could not be reconsidered under the express terms of the Federal Power Act's judicial review provision. That provision stated in relevant part that:

> Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. . . . Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. . . . The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of Title 28.

16 U.S.C. § 825*l*.

In reversing, the Supreme Court found that, through 16 U.S.C. § 825*l*, Congress had "prescribed the specific, complete and exclusive mode for judicial review of the Commission's orders." *Taxpayers of Tacoma*, 357 U.S. at 335–36. The Court focused on the statutory language providing that the court of appeals "shall have exclusive jurisdiction to affirm, modify, or set aside such order in whole or in part," and that "[t]he judgment and decree of the court . . . shall be final, subject to review by the Supreme Court of the United States," and held that these provisions barred

12

separate litigation even of an issue not presented to the Ninth Circuit. *Id.* at 336, 339 (quoting 16 U.S.C. § 825*l*). More recently, in *City of Tacoma v. Federal Energy Regulatory Commission*, 460 F.3d 53 (D.C. Cir. 2006), the United States Court of Appeals for the District of Columbia Circuit, citing *Taxpayers of Tacoma*, held that based on 16 U.S.C. § 825*l*, which applied because the Federal Energy Regulatory Commission ("FERC") is the successor to the FPC, "when a BiOp is prepared in the course of a FERC licensing proceeding, the only means of challenging the substantive validity of the BiOp is on review of FERC's decision in the court of appeals." *Id.* at 76.

Defendants' reliance on *Taxpayers of Tacoma* and its progeny is misplaced. First, the language in 16 U.S.C. § 825*l* stating that the court of appeals would have "exclusive jurisdiction" over challenges to Commission rulings, and that its judgment "shall be final," which was relied upon significantly in *Taxpayers of Tacoma*, 357 U.S. at 336, is nowhere to be found in 33 U.S.C. § 1516. Rather, that provision states only that a party aggrieved by a decision to issue a DPA license "may . . . seek judicial review" in a United States Court of Appeals, with no reference to that remedy being mandatory or exclusive. 33 U.S.C. § 1516. Such a distinction is crucial and demonstrates that the DPA judicial review provision is not exclusive. *See Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) ("Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the . . . inference' that the two have different meanings." (quoting *United States v. Ressam*, 553 U.S. 272, 276–77 (2008))).

Furthermore, as to the argument that cases such as *City of Tacoma v. FERC* establish that judicial review of a BiOp must occur in conjunction with a review of the broader licensing decision, the Fourth Circuit in *Dow* considered and rejected an almost identical argument. In *Dow*, in which the FIFRA judicial review provision had language similar to that of 33 U.S.C. § 1516

stating that the United States Court of Appeals had "exclusive jurisdiction" over an order by the

EPA Administrator "[u]pon the filing of" a petition for review, 7 U.S.C. § 136n, the Fourth Circuit

acknowledged that. pursuant to *Taxpayers of Tacoma*, such an exclusive judicial review provision

would apply to "all issues inhering in the controversy." *Dow*, 637 F.3d at 265 (quoting *Taxpayers

of Tacoma*, 357 U.S. at 336). Nevertheless, the court concluded that "a challenge to the adequacy

of the [NMFS's] BiOp is not an issue inherent in the EPA's eventual order on the reregistration of

the three insecticides under FIFRA." *Id.* In so holding, the court discussed *City of Tacoma v.

FERC* and acknowledged that it allowed for review of a BiOp in the course of a court of appeals's

review of FERC's actions, but it did not align its ruling to that decision. *Dow*, 637 F.3d at 268.

Rather, it identified five reasons in support of its different conclusion. First, the court focused on

the fact that a BiOp has "immediate and independent legal consequences," yet the acting agency

"cannot change it or modify it." *Id.* at 265. Among these independent consequences are that a

"BiOp creates a safe harbor for *all persons*," not merely the acting agency, in that a person who

"takes" a protected species while complying with the BiOp "is insulated from liability" separate

and apart from the EPA's final reregistration decision. *Id.* at 266. Second, the court reasoned that

"if the EPA were to choose not to rely on the [NMFS's] BiOp, then the BiOp would not be subject

to any review in a judicial proceeding challenging the FIFRA reregistration order" despite having

its own "significant legal consequences." *Id.*

Third, the Fourth Circuit noted that "when a court of appeals reviews the EPA's *reliance

on a BiOp* issued by the [NMFS], the court's review would not be the same as if the district court

were to review the BiOp itself directly under the APA," under which the BiOp's findings and

conclusions could be challenged. *Id.* Fourth, and relatedly, the court found that if the EPA

followed the BiOp, any challenge to that reliance on judicial review could not cause any change

14

to the BiOp because the EPA lacked authority to change the BiOp, and the NMFS "would not be a party to the proceeding." *Id.* at 267. Fifth, the court concluded that "the plain language" of the judicial review provision did not "contain 'clear and convincing evidence' that Congress intended" for it "to govern review of a BiOp issued by a different agency." *Id.*; *see Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967) (requiring "clear and convincing evidence" that Congress intended to restrict judicial review). Particularly in light of the "strong presumption that Congress intends to allow for judicial review of final agency actions," the court held that "BiOps therefore should be subject to judicial review under the APA." *Id.*

Here, *Dow* is controlling authority, and each of these reasons applies with equal or greater force. In particular, *Dow*'s fifth reason regarding the plain language of the judicial review provision carries even greater weight in this case where, as discussed above and in stark contrast to the provisions at issue in *Taxpayers of Tacoma* and *Dow*, the relevant judicial review provision does not reference "exclusive jurisdiction" or the finality of the reviewing court's judgment at all. *See* 33 U.S.C. § 1516. That provision therefore contains even less evidence, or perhaps none at all, that Congress intended for judicial review of a licensing decision by MARAD under the DPA to encompass review of a BiOp issued by a different agency. Accordingly, regardless of whether other courts have reached different conclusions, this Court is bound by *Dow*'s holding that a BiOp "is not an issue inherent" in the licensing decision that may be reviewed only pursuant to a judicial review provision such as those at issue in *Dow* and here. *Dow*, 637 F.3d at 265.

Defendants seek to distinguish *Dow* based on the fact that while the challenge to the BiOp in *Dow* was initiated and considered before the broader licensing decision was made, *see Dow*, 637 F.3d at 263, here, MARAD had already issued its license relating to SPOT prior to the filing of this case, so Plaintiffs could have challenged the BiOP in the petition for review before the Fifth

15

Circuit. Defendants further note that the United States Court of Appeals for the First Circuit has distinguished *Dow* on this basis. *See Maine Council of Atl. Salmon Fed'n v. Nat'l Marine Fisheries Serv.*, 858 F.3d 690, 694 (1st Cir. 2017). *Dow*, however, did not limit its determination to the specific circumstances present in the case; rather, the reasons it offered for concluding that a BiOp is not an issue "inhering in the controversy" to be considered on a petition for review under 7 U.S.C. § 136n are not dependent on the sequence of events. *See Dow*, 637 F.3d at 265–67.

More importantly, the Fourth Circuit has since applied *Dow* in a manner that clarifies that the proposed distinction based on timing is immaterial. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d 251, 258 (4th Cir. 2020). In *Sierra Club*, several environmental organizations challenged the decisions of two districts of the United States Army Corps of Engineers ("the Army Corps") to verify that the proposed discharge into waterways of dredged material generated during the construction of a natural gas pipeline in those districts complied with the Army Corps' 2017 nationwide permit ("NWP 12"), thereby permitting the pipeline's developer to forgo a more arduous and time-consuming individual permitting process required under the Clean Water Act. *See id.* at 254–55. The plaintiffs filed petitions for review of the verifications pursuant to the Natural Gas Act's judicial review provision, which grants to a United States Court of Appeals "original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency . . . acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law." 15 U.S.C. § 717r(d)(1); *see Sierra Club*, 981 F.3d at 255. When the plaintiffs included an argument that NWP 12 was invalid because the Army Corps had violated the ESA by failing to engage in consultation with the United States Fish and Wildlife Service ("FWS") before the reissuance of that permit, the Fourth Circuit rejected this argument on the grounds that the language in § 717r(d)(1) allowed only for review of permits

16

for natural gas pipeline projects and did not allow for review of the issuance of a nationwide permit such as NWP 12. *Id.* at 257–258. Significantly, the Fourth Circuit also rejected the argument that review of NWP 12 was permitted or required under the judicial review provision because it was an issue "inhering in the controversy" and concluded that "according to *Dow*," the challenge to the findings and conclusions underlying NWP 12 were "properly reviewable in the district court," not before the Fourth Circuit. *Id.* at 258. Where *Sierra Club* applied *Dow* to a challenge to an underlying decision such as a nationwide permit or BiOp even when the licensing or permitting decision subject to a judicial review provision had already been made, Defendants effort to distinguish *Dow* necessarily fails. The Court therefore rejects Defendants' claim that a challenge to the adequacy of the NMFS's BiOp may be brought only in a United States Court of Appeals pursuant to 33 U.S.C. § 1516. *See Dow*, 637 F.3d at 265.

Defendants' citation to *Appalachian Voices v. U.S. Department of Interior*, 25 F.4th 259 (4th Cir. 2022), as an example of the Fourth Circuit conducting "original review of a BiOp under an exclusive judicial review provision," Mot. at 11–12, does not alter the Court's conclusion. In *Appalachian Voices*, the Fourth Circuit reviewed a BiOp produced by the FWS as part of its consultation with FERC in advance of FERC's authorization of the construction of a natural gas pipeline. *Appalachian Voices*, 25 F.4th at 268. Significantly, however, the relevant judicial review provision in the Natural Gas Act expressly provides for the review of actions by other agencies that relate to the acting agency's action. *See* 15 U.S.C. § 717r(d)(1) (providing that a United States Court of Appeals "shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than [FERC]) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval . . . required under Federal law"). As discussed above, the DPA's judicial review

provision limits review by the court of appeals to actions taken by the Secretary of Transportation. *See* 33 U.S.C. § 1516. Defendants' reliance on *Appalachian Voices* is therefore unavailing.

Finally, where their argument fails under Fourth Circuit precedent, Defendants contend that this Court alternatively should apply Fifth Circuit precedent on the issue of whether the SPOT/GulfLink BiOp may be reviewed on a DPA petition for review under 33 U.S.C. § 1516 because, if it can be so reviewed, Plaintiffs' APA claim would fail because APA review is available only when "there is no other adequate remedy in a court." 5 U.S.C. § 704. Defendants cite no precedent for applying this mode of analysis, or for the conclusion that APA review would be unavailable under such circumstances. Indeed, the Fourth Circuit in *Dow* suggested that it would not reach such a conclusion when it found, in discussing *City of Tacoma v. FERC*, that to the extent a court of appeals "could expand the permissive scope of review when reviewing an acting agency's action to include review of the BiOp itself," such an expansion of judicial review "does not *preclude* judicial review of a BiOp under the APA in other procedural circumstances," which could include, as in both *Dow* and the present case, a freestanding APA claim challenging the BiOp. *Dow*, 637 F.3d at 268.

Regardless, even under Defendants' proposed approach, Defendants have not identified Fifth Circuit precedent that conflicts with Fourth Circuit precedent in a way that demonstrates that the SPOT/Gulflink BiOp could be reviewed pursuant to 33 U.S.C. § 1516. Although Defendants point to *Citizens for Clean Air* and *Gulf Restoration Network v. U.S. Department of Transportation*, 452 F.3d 362 (5th Cir. 2006), in those cases the Fifth Circuit reviewed not a BiOp, but an EIS, which under NEPA and the DPA is a report of the acting agency and thus constitutes part of the Secretary's decision subject to review under the statutory language of the DPA. *See* 42 U.S.C. § 4332(C) (providing that pursuant to NEPA, an EIS, described as a "detailed statement

18

by the responsible official on . . . reasonably foreseeable environmental effects of the proposed agency action," is made by "the head of the lead agency" in consultation with other relevant agencies); 33 U.S.C. § 1504(f) (providing that the Secretary of Transportation shall comply with NEPA for "all applications" pursuant to the DPA); *Gulf Restoration Network*, 452 F.3d at 366 (stating that, pursuant to the DPA, the Secretary of Transportation must, before issuing a license, "take various steps, including conducting an environmental review and issuing an [EIS] under NEPA"); *Citizens for Clean Air*, 98 F.4th at 189 (same); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 145 S. Ct. 1497, 1511 (2025) (stating that NEPA compelled the U.S. Surface Transportation Board, the acting agency in that case, to prepare an EIS). Significantly, the considerations that render a BiOp separate and independent from a licensing decision, as discussed in *Dow*, do not apply to an EIS. *See Dow*, 637 F.3d at 265–67; *see Seven Cnty. Infrastructure Coal.*, 145 S. Ct. at 1511 (recognizing that "NEPA imposes no *substantive* constraints on the agency's ultimate decision to build, fund, or approve a proposed project" and that, correspondingly, an EIS "is only one input into an agency's decision and does not itself require any particular substantive outcome," such that "the adequacy of an EIS is relevant only to the question of whether an agency's final decision . . . was reasonably explained").

Defendants' reliance on the cases cited in footnote 8 of *Gulf Restoration Network* is particularly unpersuasive in that they are cited only for the proposition that "NEPA guarantees a process, not a certain result," which in no way constitutes the adoption of every aspect of those cases. *Gulf Restoration Network*, 452 F.3d at 367 & n.8 (citing *Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 910–13 (9th Cir.1989); *City of Tacoma v. Nat'l Marine Fisheries Serv.*, 383 F. Supp. 2d 89, 91–93 (D.D.C. 2005); *Idaho Rivers United v. Foss*, 373 F. Supp. 2d 1158, 1160–61 (D. Idaho 2005)). In any event, those cases involved petitions for review of FERC

actions pursuant to 16 U.S.C. § 825*l* and its the exclusive jurisdiction language that, for the reasons

discussed above, are distinguishable from petitions for review under the DPA. Finally, *Sierra

Club v. U.S. Department of the Interior*, 990 F.3d 898 (5th Cir. 2021), in which the Fifth Circuit

reviewed a BiOp in relation to a natural gas pipeline project, necessarily involved a petition for

review under the Natural Gas Act, 15 U.S.C. § 717r(d)(1), which, as discussed above in relation

to *Appalachian Voices*, includes statutory language permitting the review of the actions of agencies

other than the acting agency, which is notably not present in the DPA. *Sierra Club*, 990 F.3d at

901, 904. Thus, even assuming the soundness of Defendants' argument for application of Fifth

Circuit precedent, Defendants have not shown that such precedent demonstrates that Plaintiffs'

challenge to the SPOT/GulfLink BiOp could be brought in a petition for review in that jurisdiction.

In summary, based on *Dow*, and for the reasons discussed above, the Court concludes that

the SPOT/GulfLink BiOp, which was prepared by the NMFS and not the Secretary of

Transportation or MARAD, is not subject to the DPA judicial review provision, is not inherent in

the controversy of whether a license should be granted under the DPA, and thus is not subject to

adequate judicial review through that provision. Accordingly, the Court concludes that it has

jurisdiction to review the challenge to the BiOp under 5 U.S.C. § 704.

### C.    Standing

Defendants also argue that Plaintiffs lack standing to assert their claims to the extent that

they challenge the SPOT/GulfLink BiOp as it relates to GulfLink. Because Article III of the

United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies,"

plaintiffs in federal civil actions must demonstrate standing to assert their claims. *Lujan v. Defs.

of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum" requirements of

standing consist of three elements: (1) the plaintiff must have suffered an "injury in fact"; (2) the

20

injury must be fairly traceable to the actions of the defendant; and (3) it must be "likely" that the injury will be "redressed by a favorable decision." *Id.* at 560–61 (citations omitted). Standing must be established for each claim and form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Specifically, Defendants contend that "the BiOp in this particular case cannot cause Plaintiffs any injury unless MARAD approves the construction and operation of the GulfLink project by issuing a license under the DPA," which, at the time that the Amended Complaint was filed, had not occurred. Mot. at 25. At this point, where Defendants' standing argument was a "simple" request that the Court require "Plaintiffs to seek any judicial review pertaining to GulfLink only after MARAD has concluded its licensing process," *id.* at 26, and where MARAD has now issued the GulfLink Record of Decision, Defendants necessarily must acknowledge that the injury requirement is now satisfied, so the standing argument is largely moot. *See W. Va. Chamber of Com. v. Browner*, 166 F.3d 336, 1998 WL 827315, at *1, *4 (4th Cir. Dec. 1, 1998) (unpublished table decision) (concluding that the Government's challenges to subject matter jurisdiction based on a lack of a final agency action, ripeness, and a failure to exhaust administrative remedies were mooted by the issuance of final agency action after briefing and oral argument had been completed).

To the extent that Defendants rely on a hypertechnical argument that the Amended Complaint was filed before the injury actually occurred, an argument that could easily be addressed with a further amendment, any remaining argument is one of form over substance. Nevertheless, the Court finds standing for two additional reasons. First, Defendants do not assert that Plaintiffs do not have standing to challenge the SPOT/GulfLink BiOp at all but rather that Plaintiffs do not have standing to challenge the BiOp as to GulfLink only. The BiOp, however, addresses the

21

projects jointly, and Defendants present no basis to conclude that Plaintiffs' injury resulting from the BiOp as to SPOT is insufficient to allow for a challenge to the BiOp as a whole. Second, in the related context of ripeness, the Fourth Circuit has rejected the argument that BiOps produced by a consulting agency cannot be challenged before the acting agency undertakes an action. *See Dow*, 637 F.3d at 269 (rejecting the NMFS's argument that the plaintiffs' challenge to a BiOp filed before the EPA made any FIFRA registration decision was premature "based on its view that the BiOp could become insignificant" because the "BiOp represents the culmination of [the NMFS's] decisionmaking process"). Such a decision cannot be squared with the position that the issuance of a BiOp does not satisfy the injury requirement for standing until the acting agency's final decision is rendered. *See id.*; *cf. Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 450 F.3d 930, 939–41 (9th Cir. 2006) (concluding that an environmental organization had established standing and ripeness to challenge an ITS issued in a BiOp, even though the permit requirements for the proposed project had not yet been completed). Accordingly, the Court concludes that Defendants' standing argument is unavailing.

## II.    *Res Judicata*

In their Motion, Defendants also seek dismissal pursuant to Rule 12(b)(6) on the grounds that the challenge to the SPOT/GulfLink BiOp "as to the SPOT project" is barred by the doctrine of *res judicata* based on the prior litigation and ruling in *Citizens for Clean Air*. Mot. at 21. To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual

allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Under the doctrine of *res judicata*, a final judgment on the merits in an earlier decision precludes the parties from relitigating claims that were raised or could have been raised during that action. *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004). The doctrine of *res judicata* requires: (1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits. *Id.* at 354–55. The second element is satisfied if the claims at issue in the two cases "arise out of the same transaction or series of transactions or the same core of operative facts.'" *Id.* at 355 (quoting *In re Varat Enters., Inc.*, 81 F.3d 1310, 1316 (4th Cir. 1996)). *Res judicata* bars not only claims that were actually litigated in the prior proceeding, but also claims that could have been litigated. *Id.* at 355–56. Because *res judicata* is an affirmative defense, the party seeking to invoke this defense has the burden of demonstrating that each of these elements has been satisfied. *See Taylor v. Sturgell*, 553 U.S. 880, 907 (2008) (noting that the defendant must "plead and prove" an affirmative defense such as *res judicata*); *Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir. 1991) (stating that the "party invoking res judicata must establish" the elements). Defendants assert that this case is barred by *res judicata* because Plaintiffs could have challenged the SPOT/GulfLink BiOp before the Fifth Circuit in *Citizens for Clean Air*. As discussed above, however, the Court has found that the BiOp could not be challenged in that proceeding. *See supra* part I.B. Further, even assuming that the first two elements of *res judicata* were satisfied, which the Court does not presently decide, the Court concludes that Defendants have not met their burden

23

to establish the third element of "an identity of parties or their privies in the two suits." *Pueschel*, 369 F.3d at 355.

As to the third element, it is undisputed that four of the plaintiffs in this case overlap with the plaintiffs in *Citizens for Clean Air*: Sierra Club, Center for Biological Diversity, Texas Campaign for the Environment, and Turtle Island Restoration Network. The remaining plaintiff in this case, Healthy Gulf, was not present in *Citizens for Clean Air*. Thus, on first glance, there does not appear to be an identity of parties or their privies in the two suits.

Nevertheless, Defendants assert that "it is reasonable to conclude that [Healthy Gulf] was aware of the previous litigation in [*Citizens for Clean Air*] and believed that its interests were being adequately represented" because of its "shared interest with its co-Plaintiffs in oil and gas terminals in the Gulf and its history of partnering with them in litigation, including sharing counsel in this case." Mot. at 24. This argument, however, both misapprehends the relevant legal standard for assessing privity in the *res judicata* context and runs afoul of the Supreme Court's decision in *Taylor*, in which the Court considered the various exceptions to "the general rule that 'one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" *Id.* at 893 (quoting *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)). As relevant here, the *Taylor* Court examined the exception that "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." *Id.* at 894 (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)). The Court clarified that this exception applies only "if, at a minimum: (1) The interests of the nonparty and her representative are aligned; and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty." *Id.* at 900 (citations omitted).

24

Here, Defendants focus their argument solely on whether the interests of the plaintiffs in *Citizens for Clean Air* and Healthy Gulf are aligned but provide no basis to conclude that any of the plaintiffs in the first case understood that they were acting in a representative capacity for Healthy Gulf or that the Fifth Circuit actually "took care to protect the interests" of Healthy Gulf. *Taylor*, 553 U.S. at 900, 905 (concluding that claim preclusion could not be justified under a theory of adequate representation where nothing in the record demonstrated that the plaintiff in the earlier case understood himself to be suing on behalf of the plaintiff in the later case, that the later plaintiff even knew of the earlier suit, or that the court overseeing the earlier suit took special care to protect the later plaintiff's interests); *Duckett v. Fuller*, 819 F.3d 740, 746 (4th Cir. 2016) (concluding that the adequate representation exception did not apply where there was no evidence that the plaintiff in the earlier case represented the plaintiff in the later case "through a class action mechanism or other type of representational action, such that [the earlier plaintiff] functioned as [the later plaintiff's] trustee, guardian, or fiduciary"). Where Defendants have failed to carry their burden to establish privity between Healthy Gulf and the plaintiffs in *Citizens for Clean Air*, Healthy Gulf's claims are not barred by *res judicata.*

As for the remaining four plaintiffs in this case, there is no dispute that there is identity between them and the plaintiffs in *Citizens for Clean Air*. However, Respondents have failed to demonstrate that privity exists between the defendants in the present case and those in *Citizens for Clean Air*. On this point, where the defendants in both cases are federal agencies or their officials, Defendants rely primarily on *Sunshine Anthracite Coal Co. v. Adkins* ("*Sunshine Anthracite*"), 310 U.S. 381, 402–03 (1940), and its progeny, *see, e.g.*, *Mervin v. Fed. Trade Comm'n*, 591 F.2d 821, 830 (D.C. Cir. 1978) (summarily applying *Sunshine Anthracite*). *Sunshine Anthracite* involved two proceedings: (1) an earlier proceeding in which the National Bituminous

25

Coal Commission determined that the Sunshine Anthracite Coal Company produced bituminous coal and thus was not entitled to an exemption from an excise tax levied on bituminous coal; and (2) a later proceeding in which the Sunshine Anthracite Coal Company sought to enjoin the Internal Revenue Service from collecting upon that same tax. *See Sunshine Anthracite*, 310 U.S. at 390–91. In addressing whether the second proceeding was barred by *res judicata*, the Court stated the general principle that there is "privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is *res judicata* in relitigation of the same issue between that party and another officer of the government." *Id.* at 402–03. The Court emphasized, however, that the "crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy." *Id.* at 403. In the earlier case, the authority of the National Bituminous Coal Commission was "clear" in that there could be "no question that it was authorized to make the determination of the status of appellant's coal" and thus "represented the United States in that determination." *Id.* Accordingly, the Court concluded that the earlier suit bound the United States and its subordinates, including the Internal Revenue Commissioner, such that the issue of whether the Sunshine Anthracite Coal Company was subject to the excise tax could not be relitigated in the second proceeding. *Id.*

Several United States Courts of Appeals have concluded that *Sunshine Anthracite* does not stand for a bright-line rule that federal agencies are always in privity with one another. *See, e.g.*, *United States v. Wanland*, 830 F.3d 947, 956 (9th Cir. 2016) ("Courts have not assumed that all federal agencies are in privity for res judicata purposes, and instead look to the substance of claims."); *Lampon-Paz v. U.S. Dep't of Justice*, 793 F. App'x 137, 141 n.3 (3d Cir. 2019) (citing *Facchiano Constr. Co. v. U.S. Dep't of Labor*, 987 F.2d 206, 211 (3d Cir. 1993), and noting that

*Sunshine Anthracite* did not establish "a blanket rule"). Although the Fourth Circuit has not clearly weighed in on this issue, it has applied *Sunshine Anthracite* in at least one decision in a manner that recognized the lack of a bright-line rule. *See Harms v. United States*, 972 F.2d 339, 1992 WL 203942, at \*7–8 (4th Cir. Aug. 24, 1992) (unpublished table decision). In *Harms*, in considering whether an earlier employment discrimination case against the United States Postal Service ("USPS") and the United States Postmaster General precluded a later Federal Tort Claims Act case against the United States for allegedly tortious conduct by United States postal inspectors and USPS employees that led to the plaintiff's termination, the Fourth Circuit applied the guidance from *Sunshine Anthracite* that the "crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy," *id.* at \*7 (quoting *Sunshine Anthracite*, 310 U.S. at 402–03), and found that "because the Postmaster General and the Postal Service had authority to represent the interests of the United States" in the first case, there was privity between those defendants and the federal government defendant in the later case. *Id.* at \*8.

Notably, other circuits have applied this reasoning to conclude, based on the specific facts presented, that there was a lack of privity between federal government defendants in earlier and later cases such that *res judicata* did not apply. For example, in *Facchiano Construction Company v. U.S. Department of Labor*, 987 F.2d 206 (3d Cir. 1993), in which a federal contractor that had been the subject of a debarment action by the United States Department of Housing and Urban Development ("HUD") argued that *res judicata* barred a subsequent debarment action brought by the United States Department of Labor, the United States Court of Appeals for the Third Circuit, applying *Sunshine Anthracite* so as to require that the court "look to the authority Congress delegated to both administrative agencies to bind the government in a final adjudication,"

27

concluded that there was no privity between the governmental parties and that *res judicata* did not apply because HUD did not have authority to debar participation in federal contracting programs outside its own department. *Id.* at 211–212. In another case, the First Circuit concluded that an earlier action by the Interstate Commerce Commission ("ICC") for injunctive relief did not bar a later action by the United States seeking civil penalties where "the ICC did not have statutory authority to represent the United States' interest in collecting civil penalties." *United States v. Alky Enters., Inc.*, 969 F.2d 1309, 1314–15 (1st Cir. 1992).

Here, Defendants, who have the burden to establish each element of *res judicata*, offer no argument as to whether the defendants in *Citizens for Clean Air*, specifically the United States Department of Transportation, MARAD, the Coast Guard, and their respective agency heads, had the authority to represent the interests of the NMFS, a part of NOAA, an agency within the United States Department of Commerce, an entirely different cabinet-level agency. Rather, in its reply brief, Defendants assert only that the NMFS could have joined the litigation in *Citizens for Clean Air*, a statement that appears to acknowledge that the defendants in that case could not have adequately represented the NMFS in relation to the SPOT/GulfLink BiOp. Significantly, *Dow* strongly suggests that those defendants lacked the authority to do so. In finding that a challenge to a BiOp does not "inhere[] in the challenge" to a registration or licensing decision, the Fourth Circuit relied in part on its conclusion that an acting agency such as the EPA "had no authority or requirement to address the adequacy of the BiOp itself," so "there could never be a basis for the reviewing court to vacate the BiOp" in a challenge to the registration or licensing decision, and that the EPA did not have the authority to alter the BiOp. *See Dow*, 637 F.3d at 265, 267. In any event, where Defendants have failed to present any argument or evidence on the authority of the defendants in *Citizens for Clean Air* to represent the NMFS's interests, the Court concludes that

28

Defendants have failed to meet their burden to establish the element of privity. The Motion to Dismiss will therefore be denied as to the argument based on *res judicata*.

## III.    Motion to Transfer

Alternatively, in the absence of dismissal, Defendants seek transfer of this case to the Fifth Circuit or to the United States District Court for the Southern District of Texas for the convenience of the parties under 28 U.S.C. § 1404. Where the Court has rejected Defendants' argument that the Fifth Circuit has exclusive jurisdiction over this case, *see supra* part I.B., and where Defendants have provided no other basis for transferring this case to the Fifth Circuit, the Court will consider only the request for transfer to the Southern District of Texas under 28 U.S.C. § 1404.

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought . . . ." 28 U.S.C. § 1404(a). Ordinarily, to prevail on a motion under § 1404(a), the moving party "must show by a preponderance of the evidence that the proposed transfer will better and more conveniently serve the interests of the parties and witnesses and better promote the interests of justice." *Helsel v. Tishman Realty & Constr. Co., Inc.*, 198 F. Supp. 2d 710, 711 (D. Md. 2002). The Court weighs a number of case-specific factors in making this determination, including: (1) the weight accorded to the plaintiff's choice of forum; (2) witness convenience and access to sources of proof; (3) the convenience of the parties; and (4) the interest of justice. *Trustees of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs., Inc.* ("*Trustees*"), 791 F.3d 436, 444 (4th Cir. 2015). In deciding a motion to transfer, a court may consider materials outside the pleadings. *See Vanity Fair Mills, Inc. v. T. Eaton Co.*, 234 F.3d 633, 645 (2d Cir. 1956) (*forum non conveniens*); *Huang v. Napolitano*, 721 F. Supp. 2d 46, 47 n.2 (D.D.C. 2010); *Citibank, N.A. v. Affinity Processing Corp.*, 248 F. Supp. 2d 172, 176 (E.D.N.Y. 2003).

29

As an initial matter, the parties dispute whether this case could have been brought in the Southern District of Texas. In the Motion, Defendants' argument on this point is that this action could have been filed in that District under 28 U.S.C. § 1391(e)(1)(B), which provides that venue over a case lies in a district in which the defendant is "an officer or employee" of the United States "acting in his official capacity," or the defendant is "an agency of the United States," when "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(e)(1). Specifically, Defendants assert that "a substantial part of the property that is the subject of the action" is located in Brazoria County, Texas, within the Southern District of Texas, consisting of the onshore components of the SPOT and GulfLink projects. Mot. at 28. When Plaintiffs argued in response that the statutory text "property that is the subject of the action" is most reasonably interpreted to apply only to proceedings brought *in rem*, citing *Steen v. Murray*, 770 F.3d 698, 704 (8th Cir. 2014) (construing 28 U.S.C. § 1391(b)(2)), Defendants argued for the first time that the significant infrastructure comprising SPOT and GulfLink also fits within "the prong under Section 1391(e)(1)(B) granting venue where 'a substantial part of the events or omissions giving rise to the claim' are located." Reply at 14, ECF No. 40 (quoting 28 U.S.C. § 1391(e)(1)(B)). Where Defendants asserted this argument only in their reply brief, thereby depriving Plaintiffs of the opportunity to respond to it, the Court could deem this latter argument to be been waived. *See De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) ("Generally, 'new arguments cannot be raised in a reply brief' before the district court." (quoting *United States v. Smalls*, 720 F.3d 193, 197 (4th Cir. 2013))).

Regardless, there are legitimate questions whether venue is proper in the Southern District of Texas under either prong because the "subject of the action" arguably is not specific property,

but the BiOp and the impact of the SPOT and GulfLink projects on endangered marine species located in the Gulf of Mexico. Likewise, the "events or omissions" giving rise to the claim appear to consist of the decisions and conclusions contained in the BiOp, which was not produced in that District. *See* 28 U.S.C. § 1391(e)(1)(B); *see Seafreeze Shoreside Inc. v. U.S. Dep't of the Interior*, No. 21-3276-CRC, 2022 WL 3906934, at \*3 (D.D.C. June 27, 2022) (focusing analysis under 28 U.S.C. § 1391(e)(1)(B) on locations where decisionmaking related to a permitting process and the issuance of a BiOp took place rather than where the activities being evaluated were located); *see also Ctr. for Biological Diversity v. Ross*, 310 F. Supp. 3d 119, 125 (D.D.C. 2018) (observing as part of a venue transfer analysis that a challenge to a BiOp largely arose where it was drafted).

Nevertheless, the Court need not resolve this question because even assuming that the Southern District of Texas is a proper venue for this action, the Court would still decline to transfer this case pursuant to 28 U.S.C. § 1404 based on an assessment of the relevant factors. Turning to the first factor, the plaintiff's choice of forum, the general rule is that the plaintiff's preference is afforded "substantial weight in determining whether transfer is appropriate." *Trustees*, 791 F.3d at 444. The deference accorded to the plaintiff's choice of forum should be proportional to the relationship between the forum and the cause of action and is lower when the plaintiff is not a citizen of the state or the case does not otherwise have "significant ties" to the forum. *See Carey v. Bayerische Hypo-Und Vereinsbank AG*, 370 F.3d 234, 237–38 (2d Cir. 2004) (affirming the district court's venue determination based in part on the conclusion that the weight accorded to the plaintiff's choice of forum was "diminished" because the cause of action did not have "significant ties" to that forum); *Bannister v. Wal-Mart Stores East, L.P.*, 843 F. Supp. 2d 610, 615 (E.D.N.C. 2012) (according lesser weight to the choice of forum because the plaintiffs were not residents of the forum state and alleged discrimination at their workplace in a different state).

Defendants argue that Plaintiffs' choice of forum of the District of Maryland should be accorded little weight because "none of the subject matter of this litigation is in Maryland, none of the conduct complained of occurred here, and no Plaintiff resides here." Mot. at 29 (citation omitted). In contrast, Plaintiffs argue that this District "has a meaningful connection to this controversy because Defendant is headquartered here," and several of the species that stand to be affected by the SPOT and GulfLink projects inhabit or migrate to waters in and near this District. Opp'n at 27–28, ECF No. 38.

Although Plaintiffs do not reside in Maryland, and the SPOT/GulfLink BiOp was prepared in St. Petersburg, Florida, the fact that the NMFS, the primary defendant in this case, is located in the District of Maryland establishes a significant tie to this District. Indeed, in another case challenging an NMFS BiOp relating to the environmental impacts of oil and gas projects in the Gulf of Mexico, another judge in this District found that the plaintiffs' choice of forum weighed against transfer. *See Sierra Club v. Nat'l Marine Fisheries Serv.*, No. 20-3060-PX, 2021 WL 4704842, at \*4 (D. Md. May 24, 2021) (in declining to transfer a challenge to an NMFS BiOp related to oil and gas activities in the Gulf of Mexico, relying in part on the conclusion that the "'concrete effects' of the challenged agency decisions 'will be felt nationally,' supporting Plaintiffs' choice to bring suit where the agency is headquartered," and citing similar cases). Indeed, the outcome of this litigation could affect how and under what terms the federal government may license the construction of significant oil and gas infrastructure, including the "largest crude export facility ever built in U.S. waters," while protecting endangered species, the latter of which is a function within the expertise of the NMFS. Am. Compl. ¶ 48. It is therefore reasonable to bring this challenge in the district where the NMFS is headquartered. Accordingly, the Court concludes that Plaintiffs' choice of forum is entitled to at least some weight.

The second factor, witness convenience, is "perhaps the most important factor" in determining whether a transfer of venue should be granted. *Mamani v. Bustamante*, 547 F. Supp. 2d 465, 473 (D. Md. 2008) (quoting *Cronos Containers, Ltd. v. Amazon Lines, Ltd.*, 121 F. Supp. 2d 461, 466 (D. Md. 2000)). Defendants do not claim that this factor weighs in favor of transfer. Likewise, where the NMFS is headquartered in Maryland and does not maintain a regional office in Texas, Defendants do not claim that the next factor, convenience to the parties to the litigation, favors transfer.

Where none of the other factors favor transfer, Defendants' argument centers on the interests of justice. They argue that this case should be "decided in the Southern District of Texas, where the local residents and communities stand to be most affected by the potential environmental and economic impacts." Mot. at 29. Plaintiffs respond that this case "is anything but a 'localized' controversy" and instead "concerns controversies of national policy and significance" because it "involves the protection of wide-ranging, highly migratory, imperiled wildlife whose affected populations span the entire Gulf of Mexico, the Caribbean, much of the U.S. Gulf Coast, and, in some cases, the entire North Atlantic." Opp'n at 29.

Although the SPOT/GulfLink BiOp certainly could have impacts on communities in the Southern District of Texas, the impacts cannot fairly be deemed to be limited to that District. First, as with other BiOps or other federal agency actions relating to the environmental impact of offshore oil and gas projects in the Gulf of Mexico, the impacts, particularly relating to the potential for oil spills, likely extend well beyond a single judicial district or state. *See, e.g.*, *Sierra Club*, 2021 WL 4704842, at *2 (noting that the *Deepwater Horizon* oil rig explosion released "nearly five million barrels of oil into the Gulf of Mexico" and "contaminated over 43,000 square miles of surface waters and over 1,300 miles of shoreline and killed or seriously harmed over

100,000 individuals of species listed as threatened or endangered"); *Oceana v. Bureau of Ocean Energy Mgmt.*, 962 F. Supp. 2d 70, 72, 78 (D.D.C. 2013) (declining to transfer to Alabama a challenge under NEPA and the ESA to sales of leases for oil and gas operations in "two regions of the outer continental shelf in the Gulf of Mexico," which while of interest to citizens of Alabama, cannot fairly be called a "localized controversy").

Similarly, where the projects impacted by the BiOp include "the largest crude export facility ever built in U.S. waters," Am. Compl. ¶ 48, and will involve the transfer of oil to tankers that will then transport it to the "global market," BiOp at 12, this case is fairly construed as having national and international implications. *See Sierra Club*, 2021 WL 4704842, at *5 (concluding that litigation relating to an NMFS BiOp impacting oil and gas leases in the Gulf had effects that would be "felt nationally" and collecting cases reaching similar conclusions); *Oceana*, 962 F. Supp. 2d at 72, 78. Finally, as noted in the BiOp itself, several endangered or threatened species at issue here have habitat ranges that extend throughout the Gulf of Mexico and into the North Atlantic Ocean. Specifically, species such as the green sea turtle, the Kemp's ridley sea turtle, the loggerhead sea turtle, the giant manta ray, and the oceanic whitetip shark may migrate to and be found in the Atlantic Ocean off the east coast of the United States, including near Maryland.

Notably, courts have frequently declined to transfer cases raising ESA challenges to a federal government action such as a BiOp from the district in which the relevant federal agency is headquartered to another district based on the view that the impact of the claim is national in scope. *See, e.g.*, *Ctr. for Biological Diversity v. Ross*, 310 F. Supp. 3d 119, 123, 127 (D.D.C. 2018) (declining to transfer a challenge to an NMFS BiOp related to the American lobster fishery from the District of Columbia to the District of Massachusetts, where the regional NMFS office that produced the BiOp was located and where the Government asserted economic effects would be

34

deeply felt, in part because an agency action affecting "a far-ranging endangered species 'is not just a Northeastern problem; it is a national one'" (quoting *Oceana, Inc. v. Pritzker*, 58 F. Supp. 3d 2 (D.D.C. 2013))); *Union Neighbors United, Inc. v. Jewell*, No. 13-1435-RJL, 2014 WL 12803803, at *1, *2 (D.D.C. Feb. 11, 2014) (declining to transfer a challenge to an FWS BiOp related to "the construction and operation of a wind power facility in" Ohio from the District of Columbia to the Southern District of Ohio in part because "the environmental interest in protecting this endangered species at issue in this case extends beyond Ohio"); *Ctr. for Biological Diversity v. Tidwell*, No. 16-1049-TSC, 2017 WL 6334085, at *1-2 (D.D.C. Feb. 14, 2017) (declining to transfer a challenge to an FWS BiOp related to a species inhabiting Minnesota's Superior National Forest from the District of Columbia to the District of Minnesota in part because it "was brought by national nonprofit organizations and has both nationwide and local concerns"). Thus, the interests of justice factor, while supporting litigation of this case in Southern District of Texas, also supports litigation of this case in the District of Maryland, where the NMFS's headquarters is located.

In summary, where Plaintiffs' choice of forum is entitled to some weight, the witness convenience and convenience of the parties factors do not weigh in favor of transfer, and the interests of justice in part support retaining this case in the District of Maryland, the Court finds that the 28 U.S.C. § 1404 factors do not warrant the transfer of this case to the Southern District of Texas. The Motion to Transfer will therefore be denied.

35

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss or, in the Alternative, to Transfer will be DENIED.  A separate Order shall issue.

Date:  September 4, 2025

THEODORE D. CHUANG
United States District Judge