**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| SIERRA CLUB, CENTER FOR BIOLOGICAL DIVERSITY, HEALTHY GULF, TEXAS CAMPAIGN FOR THE ENVIRONMENT and TURTLE ISLAND RESTORATION NETWORK,<br><br>Plaintiffs,<br><br>v.<br><br>NATIONAL MARINE FISHERIES SERVICE and NEIL JACOBS, *in his official capacity as the Under Secretary of Commerce for Oceans and Atmosphere and the Administrator of the National Oceanic and Atmospheric Administration,*<br><br>Defendants. | Civil Action No. 24-2699-TDC |

**MEMORANDUM OPINION**

Plaintiffs Sierra Club, Center for Biological Diversity, Healthy Gulf, Texas Campaign for the Environment, and Turtle Island Restoration Network have filed this civil action against Defendants the National Marine Fisheries Service ("NMFS"), an agency within the National Oceanic and Atmospheric Administration ("NOAA"), and the Under Secretary of Commerce for Oceans and Atmosphere and the Administrator of NOAA. Plaintiffs allege that an NMFS biological opinion addressing the effects on federally protected species and critical habitats that would result from the construction and operation of two deepwater crude oil export terminals in the Gulf of Mexico violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, and the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544. Plaintiffs have filed

a Motion to Complete or Supplement the Record, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, the Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

This case arises out of the proposed construction and operation of two deepwater crude oil export terminals in the Gulf of Mexico[1]: the Sea Port Oil Terminal ("SPOT") and the Texas GulfLink Deepwater Port Project ("GulfLink"). The Court incorporates by reference the background and procedural history set forth in its September 4, 2025 Memorandum Opinion resolving Defendants' Motion to Dismiss or, in the Alternative, to Transfer. *Sierra Club v. Nat'l Marine Fisheries Serv.*, 803 F. Supp. 3d 429, 434–37 (D. Md. 2025). The Court restates below material aspects of the statutory and regulatory framework and provides the specific factual background relevant to the present Motion.

### I. Statutory and Regulatory Framework

To initiate projects such as SPOT and GulfLink, developers of deepwater ports are required to seek licenses from the United States Secretary of Transportation pursuant to the Deepwater Port Act ("DPA"), 33 U.S.C. §§ 1501–1523. *See* 33 U.S.C. § 1503(a), (b). The authority to issue such licenses has been delegated to the United States Maritime Administration ("MARAD"), a component agency of the United States Department of Transportation ("DOT"), in coordination with the United States Coast Guard ("the Coast Guard"), which was formerly part of DOT and retained the authorities delegated to it by the Secretary of Transportation upon its transfer to the

---

[1] The Court uses the name for this body of water used by the parties in their filings.

United States Department of Homeland Security. *See* 49 C.F.R. § 1.93(h)(1)–(2); 6 U.S.C. § 468(b).

The licensing of a deepwater port is conditioned on the satisfaction of several requirements, including compliance with various environmental statutes and regulations. First, the Coast Guard and MARAD must comply with the requirements of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4331–4336e. *See* 33 U.S.C. § 1504(f). Under NEPA, "all agencies of the Federal Government" must "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on," among other considerations, "the reasonably foreseeable environmental effects of the proposed agency action." 42 U.S.C. § 4332(C). Moreover, the agency authoring this environmental impact statement ("EIS") must "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." *Id.* In this instance, the Coast Guard and MARAD were responsible for the preparation of the relevant EISs on behalf of DOT.

Second, the Coast Guard and MARAD must comply with the ESA. The ESA was enacted to "provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Accordingly, Section 7 of the ESA requires the listing of species as endangered or threatened based on enumerated statutory factors, as well as the designation of critical habitat for endangered and threatened species to protect those areas essential to those species' conservation. *See* 16 U.S.C. § 1533(a)(1), (3). The ESA further requires each federal agency to "insure that any action authorized, funded, or carried

out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined . . . to be critical." 16 U.S.C. § 1536(a)(2). In turn, the ESA mandates a consultation process under which an agency seeking to undertake an action ("the action agency") with potential implications for an endangered or threatened species or a critical habitat must confer with the agency with expertise relating to the species ("the consulting agency") "on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed" as endangered or threatened under the ESA "or result in the destruction or adverse modification of critical habitat proposed to be designated for such species." 16 U.S.C. § 1536(a)(4). As relevant here, the NMFS acts as the consulting agency with respect to most marine species. *See* 50 C.F.R. § 402.01(b).

The consultation process requires the consulting agency, among other obligations, to review all relevant information provided by the action agency or that is otherwise available, evaluate the current status and environmental baseline of any listed species or critical habitat, evaluate the effects of the proposed agency action and cumulative effects on any listed species or critical habitat, formulate an opinion as to "whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat," and discuss these findings with the action agency. 50 C.F.R. § 402.14(g). At the end of the consultation process, the consulting agency issues a biological opinion ("BiOp") that provides an assessment of the effects of the agency action on endangered or threatened species and on critical habitats. *See* 16 U.S.C. § 1536(b)(3)(A). If the consulting agency concludes that the proposed agency action is likely to jeopardize a listed species or result in adverse modification of its critical

habitat, it must propose reasonable and prudent alternatives, if available, to implement the agency action without these adverse impacts. *See id.*; 50 C.F.R. § 402.14(h)(2).

In addition, Section 9 of the ESA prohibits "any person" from acting to "take" an endangered species, 16 U.S.C. § 1538(a)(1)(B), a term defined to mean to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect," 16 U.S.C. § 1532(19). In cases in which the consulting agency determines that a proposed agency action will result in such a taking of a listed species, it must include in the BiOp an incidental take statement ("ITS") that specifies "the impact of incidental taking as the amount or extent of such taking" as well as "reasonable and prudent measures" considered to be "necessary or appropriate to minimize such impact of incidental taking on the species." 50 C.F.R. § 402.14(i).

## II. Procedural History

On November 9, 2022, NMFS issued a single BiOp relating to both the SPOT and GulfLink projects ("the BiOp") in which it generally concluded that the proposed projects are not likely to adversely affect or jeopardize ten different species within NMFS's jurisdiction, and that although the designated critical habitat of the loggerhead sea turtle is likely to be adversely affected, the projects will not result in the destruction or adverse modification of such habitat. In Count 1 of the presently operative Amended Complaint, Plaintiffs assert that NMFS's analysis as stated in the BiOp was arbitrary, capricious, an abuse of discretion, and not in accordance with Section 7 of the ESA, all in violation of the APA, 5 U.S.C. § 706(2)(A). In Count 2, Plaintiffs assert that NMFS's ITS incorporated into the BiOp, which specified the impact of the SPOT and GulfLink projects in terms of resulting incidental deaths of ESA-listed species, was arbitrary, capricious, an abuse of discretion, and not in accordance with Section 7 of the ESA, all in violation of the APA. After the Court denied Defendants' Motion to Dismiss or, in the Alternative, to Transfer, Defendants filed

an Answer to the Amended Complaint, and lodged the administrative record underlying the issuance of the BiOp. Plaintiffs then filed the Motion to Complete or Supplement the Administrative Record. the corrected version of which includes a Joint Record. At the Court's direction, Defendants have submitted the disputed documents for *in camera* review.

**DISCUSSION**

In their Motion, Plaintiffs seek to compel Defendants to complete the administrative record by including materials that NMFS allegedly considered in issuing the BiOp but omitted from the record. In the alternative, Plaintiffs seek an order requiring the supplementation of the record with the additional materials.

In the Motion, Plaintiffs have sought the addition of three categories of materials to the administrative record ("Categories 1–3"): (1) certain documents referenced and relied upon in the final BiOp, as listed in Exhibit 14 of the Joint Record, *see* Joint Record ("J.R.") 1596–97, ECF Nos. 80-1 to 80-8; (2) NMFS's communications with the Coast Guard, MARAD, the applicants seeking approval of the SPOT and GulfLink projects, and third-party consultants relevant to the challenged BiOp, as referenced in a "Consultation History" contained in the BiOp; and (3) Plaintiffs' public comment letter submitted in relation to the draft environmental impact statement ("EIS") for the SPOT project prepared by the Coast Guard and MARAD. The items within Categories 2 and 3 are summarized in Exhibit 45 of the Joint Record, J.R. 5780. For ease of reference, the Court will refer to each of these items with the name provided in Exhibit 45.

In Category 1, Plaintiffs seek to add to the administrative record certain studies and reports cited in the text of the BiOp but omitted from the administrative record, including Volumes II, III, and IV of the Final SPOT EIS. Volume IV contains Appendix H, an Oil Spill Risk Analysis conducted by the Coast Guard's third-party consultant, Environmental Resources Management

Southwest, Inc. ("ERM"), and Appendix X, an Oil Spill Modeling Technical Report that summarizes oil spill modeling performed by ERM.

In relation to this category, NMFS has determined that 38 of the identified documents were actually already contained in the administrative record, and they have agreed to add 57 of the documents identified in Exhibit 14, which they assert were "omitted from the administrative record inadvertently because they were not listed in the BiOp's Literature Cited section despite having been cited in the text of the BiOp." Opp'n at 5, ECF No. 78. As for the missing volumes of the Final SPOT EIS, NMFS has taken the position that they need not be added because the BiOp does not cite to those volumes and "NMFS staff did not access or review those volumes." *Id.* at 12. Nevertheless, NMFS has consented to adding Appendices H and X contained in Volume IV of the Final SPOT EIS to the administrative record. Where Plaintiffs acknowledge that these additions would include many, though not all, of the documents identified in Exhibit 14, they are no longer seeking the addition of the remaining documents in this category. The Court therefore need address only Categories 2 and 3.

## I. Completion of the Record

In arguing that Categories 2 and 3 should be included in the administrative record, Plaintiffs argue that they were either directly or indirectly considered in the preparation of the BiOp. They further assert that to the extent that certain materials were not included because NMFS contends that they are subject to the deliberative process privilege, they disagree that the privilege is applicable.

### A. Legal Standards

#### 1. APA Administrative Record

When adjudicating an APA claim, a court must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The whole record includes "everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc'y v. Endangered Species Comm.,* 984 F.2d 1534, 1548 (9th Cir. 1993); *see B&B P'ship v. United States*, No. 96-2025, 1997 WL 787145, at *3 (4th Cir. Dec. 24, 1997) (quoting *Portland Audubon Soc'y*, 984 F.2d at 1548). Thus, "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam); *see Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1335 (4th Cir. 1995) ("Judicial review of administrative action is generally confined to the administrative record."). The administrative record includes all materials "directly or indirectly considered by agency decision-makers." *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555 (9th Cir. 1989) (citation omitted). Documents considered by the agency include all materials that "might have influenced the agency's decision," not just those on which the agency actually relied in making its final decision. *Amfac Resorts, L.L.C. v. U.S. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001); *see also Nat'l Courier Ass'n v. Bd. of Governors of the Fed. Rsrv. Sys.*, 516 F.2d 1229, 1241 (D.C. Cir. 1975). Such materials can include documents containing evidence contrary to the agency's final position. *See Thompson*, 885 F.2d at 555; *Lee Mem'l Hosp. v. Burwell*, 109 F. Supp. 3d 40, 46 (D.D.C. 2015).

The agency "may not unilaterally determine what constitutes the administrative record." *Lee Mem'l Hosp.*, 109 F. Supp. 3d at 47 (quoting *Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197 (D.D.C. 2005)). However, as part of the "presumption of regularity" traditionally

afforded to government officials carrying out their duties, "when an agency certifies that the administrative record it has provided to the court is complete, courts generally presume it to be so absent clear evidence to the contrary." *Mestanek v. Jaddou*, 93 F.4th 164, 172 (4th Cir. 2024).

To overcome the presumption that the government properly designated the record, the plaintiff must "(1) identify reasonable, non-speculative grounds for the belief that the documents were considered by the agency and not included in the record, and (2) identify the materials allegedly omitted from the record with sufficient specificity, as opposed to merely proffering broad categories of documents and data that are 'likely' to exist as a result of other documents that are included in the administrative record." *S.C. Coastal Conservation League v. Ross*, 431 F. Supp. 3d 719, 723 (D.S.C. 2020) (quoting *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Security*, No. ELH-16-1015, 2017 WL 3189446, at *13 (D. Md. July 27, 2017)); *see Clinch Coal. v. U.S. Forest Serv.*, 693 F. Supp. 3d 643, 653 (W.D. Va. 2023).

A plaintiff may move to "complete" the administrative record with "materials which were actually considered by the agency, yet omitted from the administrative record." *WildEarth Guardians v. U.S. Forest Serv.*, 713 F. Supp. 2d 1243, 1253 (D. Colo. 2010). To succeed on such a motion, the plaintiff must overcome the presumption of regularity "by putting forth concrete evidence that the documents it seeks to 'add' to the record were actually before the decisionmakers." *The Cape Hatteras Access Preservation Alliance v. U.S. Dep't. of the Interior* ("*Cape Hatteras*"), 667 F. Supp. 2d 111, 114 (D.D.C. 2009); *see S.C. Coastal Conservation League*, 431 F. Supp. 3d at 723. The administrative record is not limited to documents that were directly reviewed by the relevant decision makers, as documents may be deemed to be indirectly considered by the decisionmaker and therefore part of the administrative record if they were relied on by subordinates who directly advised the ultimate decisionmaker. *See Amfac Resorts*, 143 F.

Supp. 2d at 12; *Ctr. for Native Ecosystems v. Salazar*, 711 F. Supp. 2d 1267, 1276 (D. Colo. 2010). Further, a party need not show that the decisionmaker read the particular document if it can show that it was "so heavily relied on in the recommendations that the decision maker constructively considered it." *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1276.

**2. Deliberative Process Privilege**

A complete administrative record does not include privileged materials, such as documents that fall within the deliberative process privilege. *See Town of Norfolk v. U.S. Army Corps of Eng'rs,* 968 F.2d 1438, 1457–58 (1st Cir. 1992); *Tafas v. Dudas*, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008). The deliberative process privilege "shields from disclosure 'documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.* (*"Sierra Club*"), 141 S. Ct. 777, 785 (2021) (quoting *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975)). The privilege "serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). To be subject to the deliberative process privilege, a document must meet two requirements: (1) it must be predecisional; and (2) it must be deliberative. *Sierra Club*, 141 S. Ct. at 785–86.

To be predecisional, a document must have been "generated before the agency's final decision on the matter." *Id.* Predecisional documents are "prepared in order to assist an agency decisionmaker in arriving at his decision." *City of Virginia Beach v. U.S. Dep't of Commerce*, 995 F.2d 1247, 1253 (4th Cir. 1993) (quoting *Renegotiation Bd. v. Grumman Aircraft Eng'g Corp.*, 421 U.S. 168, 184 (1975)). To be deliberative, the document must have been "prepared to help

the agency formulate its position." *Sierra Club*, 141 S. Ct. at 786. It must reflect "the give-and-take of the consultative process" used by the agency. *Coastal States Gas Corp.*, 617 F.2d at 866. "[R]ecommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency" or materials "which would inaccurately reflect or prematurely disclose the views of the agency" are generally considered deliberative. *Id.* While draft documents are often protected by the privilege, the label "draft" is not determinative, and courts must evaluate whether the documents actually constitute a "preliminary version of a piece of writing subject to feedback and change." *Sierra Club*, 141 S. Ct. at 786.

Courts have applied the deliberative process privilege to cover communications not just within a single agency, but also between governmental agencies. *See, e.g.*, *id.* at 784, 786–88 (holding that draft biological opinions which were required under the relevant regulatory scheme to be circulated among the U.S. Fish and Wildlife Service, NMFS, and the Environmental Protection Agency were protected by the deliberative process privilege); *In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. MDL 18-MN-2873-RMG, 2023 WL 10997790, at *2 (D.S.C. June 28, 2023) (recognizing that *Sierra Club* "makes clear [that] the deliberative process privilege is not rendered moot by the sharing of predecisional, deliberative material between agencies").

The deliberative process privilege may also extend to documents and communications between government agencies and their outside contractors or consultants. In addressing the exemption to the Freedom of Information Act ("FOIA") commonly referred to as Exemption 5, 5 U.S.C. § 552(b)(5), which protects from public disclosure intra-agency documents subject to civil discovery privileges including the deliberative process privilege, the United States Supreme Court

recognized that in certain situations, documents submitted by outside consultants may "play[] essentially the same part in an agency's process of deliberation as documents prepared by agency personnel might have done" and concluded that the FOIA exemption premised in part on the privilege can be applied when the outside consultant does "not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Dep't. of the Interior v. Klamath Water Users Protective Ass'n* ("*Klamath*"), 532 U.S. 1, 8, 10–11 (2001). The United States Court of Appeals for the Fourth Circuit and other circuits have applied this reasoning in concluding that communications between government agencies and third-party consultants or contractors who function similarly to agency personnel can be protected from disclosure under Exemption 5 when based on the deliberative process privilege. *See, e.g.*, *Manivannan v. Dep't. of Energy, Nat'l Energy Tech. Lab'y*, 843 F. App'x 481, 484 (4th Cir. 2021) (remanding for the district court to "apply *Klamath* and determine whether the nature of the relationships between agency employees and any third party recipients of the requested records bar" the agency's application of the exemption); *Stewart v. U.S. Dep't. of the Interior*, 554 F.3d 1236, 1245 (10th Cir. 2009) (extending the application of Exemption 5 based on the deliberative process privilege to documents authored by a paid government consultant because he "functioned akin to an agency employee"); *Nat'l Inst. of Mil. Justice v. U.S. Dep't. of Defense*, 512 F.3d 677, 680–81 (D.C. Cir. 2008) (finding that Exemption 5 was created to protect the deliberative process of the government and finding that it could be applied to agency records "solicited by the agency" and "submitted by outside consultants as part of the deliberative process").

However, the privilege may be lost if the government agency expressly chooses "to adopt or incorporate by reference" protected material into a document that constitutes final agency action. *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 161 (1975); *see Coastal States Gas Corp.*,

617 F.2d at 866 ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."). This exception applies when "an agency holds out that it agrees with the reasoning contained within a deliberative and predecisional document." *Clinch Coal.*, 693 F. Supp. 3d at 651. The deliberative process privilege also does not apply to "protect purely factual material unless it is so intertwined with predecisional, deliberative material that revelation of the factual material would expose the protected information." *Empower Oversight Whistleblowers & Rsch. v. Nat'l Institutes of Health*, 122 F.4th 92, 105 (4th Cir. 2024).

**B. Category 2: Consultation History Communications**

As to Category 2, Plaintiffs have sought the addition of various communications among NMFS, the Coast Guard, MARAD, the GulfLink project applicant, and ERM, the Coast Guard's third-party consultant, referenced in the Consultation History of the BiOp; the unredacted version of a March 4, 2021 email exchange between NMFS and the Coast Guard; and four documents attached to email communications between NMFS and Coast Guard staff and between NMFS and ERM staff.

Plaintiffs also seek unspecified "interagency and third-party communications" that NMFS characterizes as "non-substantive communications," as well as "all other interagency and third-party communications relevant to the BiOp that are not in the record." J.R. 5780.

**1. Communications Referenced in the BiOp Consultation History**

These documents include the first four entries listed in Exhibit 45: NMFS's "Email exchanges [with] [the Coast Guard], [GulfLink] and third party consultants between June 27, 2019 and May 11, 2020"; "Email exchanges and document reviews between May 11, 2020 and December 1, 2020"; the "Series of email exchanges between December 1, 2020 and March 3,

2021"; and the "March 3, 2021 NMFS's information request." *Id.* Defendants have stated that an email dated June 27, 2019 that falls within the first entry is already included in the administrative record as a "formal letter requesting technical assistance" dated May 11, 2020, but Plaintiffs contend that that letter appears to be a different document than the "June 27, 2019 email requesting [NMFS's] assistance with the review of the [GulfLink] deepwater port application" underlying this request. Reply at 5, ECF No. 79. Defendants assert that there are "[n]o documents to produce" for the other three entries. J.R. 5744.

Upon *in camera* review, the Court concludes that a significant portion of the documents constitute non-substantive emails and other communications, such as emails discussing the scheduling of a meeting or telephone call, communications about the expected timeline for certain process steps to occur, or lists of contact information for individuals from the various agencies involved in reviews relating to the SPOT and GulfLink projects. Such communications are not fairly deemed to be part of the administrative record because they are unconnected to the merits of NMFS's decision. *See Portland Audubon Soc'y,* 984 F.2d at 1548 (defining the administrative record as "everything that was before the agency pertaining to the merits of its decision").

The vast majority of the remaining documents consist of emails and other communications among personnel from government agencies and their contractors or consultants such as ERM which are protected from disclosure by the deliberative process privilege. First, as stated above, and contrary to Plaintiffs' position, the deliberative process privilege may protect communications with other governmental agencies and with third-party consultants retained by an agency to act in the agency's interest. *See Sierra Club,* 141 S. Ct. at 784, 788; *Klamath*, 532 U.S. at 10–12. Notably, Plaintiffs' reliance on case law such as *South Carolina Coastal Conservation League*, 431 F. Supp. 3d at 724, for its position on this point is unpersuasive, as those cases predate *Sierra*

*Club*, and in fact the judge who issued *South Carolina Coastal Conservation League* reached the opposite conclusion after the issuance of, and in reliance on, *Sierra Club*. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 2023 WL 10997790, at *2.

Second, the Court concludes that the requirements for application of the deliberative process privilege are met. The emails and other communications that substantively discuss various aspects of the review of the SPOT and GulfLink applications, including the EIS and the BiOp, are predecisional in that they all predate NMFS's "final decision on the matter" in the BiOp issued on November 9, 2022. *Sierra Club*, 141 S. Ct. at 786. They are also deliberative in that they reflect the "give-and-take of the consultative process." *Coastal States Gas Corp.*, 617 F.2d at 866. For example, some provide comments on drafts of the EIS or other documents, others memorialize comments and opinions expressed at interagency meetings, and others constitute email exchanges among agency personnel about substantive issues relating to the evaluation of these projects. As "documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated," these communications fall within the ambit of the privilege. *Sierra Club*, 141 S. Ct. at 785.

There are a limited number of communications sent to or from GulfLink which are not subject to the deliberative process privilege because GulfLink was neither a government agency nor a consultant acting in such an agency's interest but was instead one acting with its "own … interests in mind." *Klamath*, 532 U.S. at 12. Nevertheless, such documents should be added to the administrative record only if they were "directly or indirectly considered" by the agency decisionmaker. *Thompson*, 885 F.2d at 555. Upon *in camera* review, the Court finds that the only emails sent between GulfLink and the government agencies were an email dated July 1, 2019 in which a GulfLink representative sent to various federal agencies a SharePoint link to the GulfLink

Licensing Application and follow-up emails in which GulfLink was informed that the application contained certain sensitive data protected by state law and then sent a revised version without such information. The Court does not find a basis to conclude that these emails were "considered" by NMFS in drafting the BiOp, particularly where the July 1, 2019 email did not actually attach the GulfLink application or provide any substantive information relevant to the merits of the BiOp decision that "might have influenced the agency's decision." *Nat'l Courier Ass'n*, 516 F.2d at 1241; *Portland Audubon Soc'y,* 984 F.2d at 1548.

Finally, there are a limited number of attachments to emails that are not already included in the administrative record that would not qualify as deliberative, including, for example, a notification letter to federal agencies about the GulfLink application and a Federal Register notice about the application, both attached to a June 26, 2019 email from the Coast Guard to various federal agencies, which Plaintiffs have correctly identified as different from a May 11, 2020 letter requesting technical assistance from NMFS that has already been included in the administrative record. These documents, as well as certain other attachments that include documents that appear to have been submitted by SPOT, are similar to other documents already included in the administrative record. Accordingly, the Court will direct Defendants to review these documents and submit a Notice stating whether they agree to add them to the administrative record or why they are properly excluded from the administrative record.

**2. Redactions in the March 4, 2021 NMFS-Coast Guard Emails (J.R. 1575–77)**

The Court determines that the redacted portions of these email exchanges are protected by the deliberative process privilege. As noted above, the fact that these communications were shared with another federal agency outside of NMFS, and the fact that some appear to include a contractor working for NMFS, does not prevent application of the deliberative privilege. *See supra* part I.A.2.

The Court concludes that the redacted portions are predecisional as they predate the final BiOp and were generated in the process of the agency arriving at a decision, and that they are deliberative because the redacted portions were part of an exchange in which NMFS sought additional information from the Coast Guard in relation to the assessment of the SPOT project's noise reduction measures, and they provide views and comments that go beyond the communication of facts. Thus, the request to add the unredacted material from this document to the administrative record will be denied.

**3. "SPOT Description Draft for AA review" Attachments (J.R. 260–61)**

Having reviewed the contents of the attachments, the Court concludes that they are draft documents constituting preliminary versions of the description of the proposed SPOT project that were still subject to change and feedback before the finalized version was incorporated into the BiOp. The attachments are thus protected by the deliberative process privilege. *See Sierra Club*, 141 S. Ct. at 786. As to the attachment entitled "SPOT Description Draft for AA review," the NMFS consultant sending the attachment specifically referred to it as a "draft project description for the SPOT portion" of the BiOp and asked the Coast Guard official to "confirm that the content in the attached description is accurate" and to "respond to the comments/questions/confirmations" included on the draft. J.R. 260. As to the attachment entitled "SPOT Description Draft for AA review_EDITED," the Coast Guard official who sent it back to NMFS specifically stated that it contained "corrections to the SPOT project descriptions in comments and tracked changes." J.R. 261. The Court's review of these documents confirms that they contain numerous comments and responses reflecting the typical "give-and-take of the consultative process" in which NMFS engaged in preparing the BiOp that is protected by the deliberative process privilege. *Coastal*

*States Gas Corp.*, 617 F.2d at 866. The request to include these items in the administrative record will therefore be denied.

**4. "Noise_Calc_Compare_ERM_JND" Attachments (J.R. 1584–89)**

These documents were attached to email exchanges between personnel at NMFS and ERM. The attachment entitled "Noise_Calc_Compare_ERM_JND" was sent from an NMFS biologist to an ERM consultant providing comments and questions on a comparison between the SPOT project applicant's underwater noise calculations and ERM's replication of those calculations. *See* J.R. 1582–83. The attachment entitled "Noise_Calc_Compare_ERM_JND_TDE" contains responses to the NMFS comments and questions and edits to the document, which the consultant noted would be discussed in further detail in a subsequent call between ERM and NMFS. J.R. 1588–89.

As discussed above, where ERM was acting as a consultant for the Coast Guard and not in the interest of a non-governmental entity, these communications may still be subject to the deliberative process privilege. *See Sierra Club*, 141 S. Ct. at 784, 788. Upon *in camera* review, the Court concludes these attachments are predecisional and deliberative. They were sent by email between ERM and NMFS in January 2021, prior to the issuance of the BiOp. J.R. 1584; J.R. 1588–89. They are also deliberative, as the comments and questions sent between NMFS and ERM reflect a review process that resulted in ERM making changes to the document. In addition, as reflected in the emails to which these documents were attached, the calculations were not yet finalized, as the data were to be the subject of further discussion on a subsequent call. J.R. 1588. Though the calculations could constitute factual information, the data is "so intertwined" with the exchange of views between NMFS and ERM, including whether there were any issues with the data, that it is not possible to order the disclosure of the numbers without exposing the privileged

portions. *Empower Oversight Whistleblowers & Research*, 122 F.4th at 105. The Motion will therefore be denied as to these attachments.

### 5. Other Interagency and Third-Party Communications

Plaintiffs also seek "interagency and third-party communications that NMFS characterizes as 'non-substantive communications to schedule meetings or provide updates on the status of the consultation.'" J.R. 5780. This description appears to reference the language in the Declaration of Dennis L. Klemm, J.R. 5738, used to characterize certain email exchanges referenced in the Consultation History section of the BiOp that are not already included in the administrative record. To the extent that this request seeks to include in the administrative record communications addressed above, *see supra* part I.B.1, the request will be denied for the same reasons.

To the extent Plaintiffs are seeking additional, unspecified communications, the request will be denied because it fails to "identify the materials allegedly omitted from the record with sufficient specificity" and instead "merely proffer[s] broad categories of documents and data that are 'likely' to exist as a result of other documents that are included in the administrative record." *S.C. Coastal Conservation League*, 431 F. Supp. 3d at 723. For the same reason, the Court will deny the request to complete the administrative record by adding the last category of documents, "all other interagency and third-party communications relevant to the BiOp that are not in the record." J.R. 5780.

### C. Category III: Plaintiffs' Public Comment Letter

In Category 3, Plaintiffs seek the inclusion in the administrative record of its March 23, 2020 public comment letter, and all of its attachments, submitted in relation to the draft SPOT EIS. Although Defendants assert that NMFS did not actually review or consider the public comment letter in preparing the BiOp, Plaintiffs argue that the public comment letter was at least "indirectly

considered" by NMFS decisionmakers and therefore should be included in the administrative record. *See Thompson*, 885 F.2d at 555.

There is no dispute that, as to public comment letter, Plaintiffs have identified the materials allegedly omitted from the record with "sufficient specificity." *S.C. Coastal Conservation League*, 431 F. Supp. 3d at 723. Thus, to overcome the presumption that NMFS correctly designated the administrative record when it excluded the letter, Plaintiffs must provide "reasonable, non-speculative grounds for the belief" that the public comment letter was "considered by the agency." *Id.*

Here, Plaintiffs submitted the public comment letter not to NMFS in relation to the BiOp itself, but to the Coast Guard and MARAD, the action agencies for the SPOT and GulfLink projects with responsibility for producing the SPOT EIS. According to Plaintiffs, the public comment letter should be deemed to have been considered by NMFS, most specifically because NMFS undisputedly considered and relied on the SPOT EIS, and the BiOp's analysis on the effects of the SPOT and GulfLink projects on endangered species directly relied on an assessment of crude oil spills, conducted by ERM and contained in both the draft and final SPOT EIS, that included a Spill Risk Analysis premised on a "worst credible oil spill discharge scenario." Mot. Complete Record at 8–9, ECF No. 77-1. In turn, Plaintiffs contend that the Coast Guard, in preparing the SPOT EIS's discussion on this issue, specifically considered the public comment letter and its attached technical review of the oil spill risk analysis ("the technical review") by Dr. Susan C. Lubetkin, which directly addressed these aspects of the draft SPOT EIS, including ERM's discharge scenario on which the BiOp "heavily relies." *Id.* at 9.

As discussed above, materials properly deemed to be part of the administrative record as "indirectly considered" by the decision-maker include those relied upon by subordinates who

directly advised the ultimate decisionmaker, *Amfac Resorts*, 143 F. Supp. 2d at 12, and those "so heavily relied on in the recommendations that the decision maker constructively considered it," *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1276. As to the latter scenario, the mere fact that a document considered by an agency decisionmaker referenced or cited another document is insufficient to demonstrate that the cited document was indirectly considered by the decisionmaker. *See Save the Colorado v. Dep't of the Interior*, 517 F. Supp. 3d 890, 898–99 (D. Ariz. 2021); *Cape Hatteras*, 667 F. Supp. 2d at 114.

In the present context of whether materials referenced in a foundational report such as the SPOT EIS were considered by the decisionmaker, courts have taken a fact-based approach in determining whether there has been a sufficient showing that the referenced materials were indirectly considered and focus on whether "the foundational report[] relied heavily on the referenced materials." *Save the Colorado*, 517 F. Supp. 3d at 899; *Oceana, Inc. v. Pritzker*, No. 16-cv-06784-LHK (SVK), 2017 WL 2670733, at *4 (N.D. Cal. June 21, 2017) (providing that a decisionmaker can be deemed to have "constructively considered" materials "upon which a report that was considered rely heavily").

In one case, the plaintiffs sought the inclusion of all documents used by the intermediary agency, the Alaska Department of Transportation and Public Facilities ("Alaska DOT"), to prepare the EISs that the decisionmaker agency, the Federal Highway Administration ("FHWA"), relied upon in approving a proposed highway project. *See Se. Alaska Conservation Council v. Fed. Highway Admin.*, No. 06-cv-00009 JWS, 2007 WL 2988013, at *1–3 (D. Alaska Oct. 10, 2007). FHWA opposed the addition of those documents on the basis that the documents considered by Alaska DOT were not actually considered by the FHWA. *Id.* at *3–4. The court denied the plaintiffs' request that all documents considered by the intermediary agency in preparing the EIS

be included in the administrative record on the grounds that such an "open-ended request goes beyond the scope of what is necessary for effective judicial review." *Id.* However, the court allowed the addition to the administrative record of certain records from Alaska DOT's Special Projects File because although the FHWA did not prepare the EISs, its staff had "'participated extensively in reviewing and commenting on the [EISs] during the preparation process,' which demonstrated that some of the documents were at least indirectly considered by the FHWA." *Id.*

In *Georgia River Network v. U.S. Army Corps of Engineers*, No. 10-CV-267, 2012 WL 930325 (S.D. Ga. Mar. 19, 2012), *aff'd*, 517 F. App'x 699 (11th Cir. 2013), the plaintiffs sought the inclusion in the administrative record of a national survey conducted by the U.S. Department of the Interior ("Interior") that provided the fishing participation rates used in a fishing study that the U.S. Army Corps of Engineers ("Army Corps"), the defendant agency, heavily relied upon in justifying its action. *Id.* at *4. Even though it was undisputed that the Army Corps had never reviewed the Interior national survey and did not have it in its possession, the court ordered its inclusion in the administrative record as "constructively considered" by the Army Corps because the fishing study explicitly stated that it was utilizing the fishing participation rates from the Interior survey, and that survey was one of only two sources cited in the fishing study. *Id.* at *4–5.

In contrast, in *Save the Colorado*, where the plaintiff argued for the inclusion in the administrative record of scientific articles on the impact of climate change on the Colorado River basin water supply that were referenced in two Colorado River basin studies undisputedly relied upon by the decisionmaker in a determination about the long-term management of the Glen Canyon Dam, the court declined to add the scientific articles to the administrative record where the plaintiff had "provide[d] only two tables that list each reference" to the scientific articles

contained in the two studies and provided no showing that they were heavily relied upon. *Save the Colorado*, 517 F. Supp. 3d at 899.

Likewise in *Cape Hatteras*, cited by Defendants, the court held that even though the parties agreed that a BiOp had been heavily relied upon by the intermediary agency, the National Park Service, in preparing another report called the "Interim Strategy" that was undisputedly considered by the decisionmaker agency, the U.S. Fish and Wildlife Service ("FWS"), in making a determination about critical habitats for a threatened species, "that fact alone does not mean [the BiOp] was actually before the [FWS] when it made its current decision." *Cape Hatteras*, 667 F. Supp. 2d at 113–14. The presence of multiple references to the BiOp in documents in the administrative record, and the fact that some comments received by FWS mentioned the BiOp, were insufficient to demonstrate that it was indirectly considered by the decisionmaker agency. *Id.* at 114. Similarly, in *Center for Native Ecosystems*, the court denied the plaintiffs' request to add to the record certain BiOps that were arguably considered by a subordinate field office of the FWS, the decisionmaker agency, where the only references to the BiOps were two to four statistics in a table that the court found "cursory" and thus insufficient to demonstrate that the FWS had constructively considered the BiOps. *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1277.

Thus, courts recognize that a document referenced in a "foundational report[]" can be deemed indirectly considered by the decisionmaker, but only if the foundational report relied heavily on it, and not if it was merely referenced or cited in a limited way. *Save the Colorado*, 517 F. Supp. 3d at 899; *see Oceana*, 2017 WL 2670733, at *4; *Georgia River Network*, 2012 WL 930325, at *5. Here, there is some specific evidence that the use of the public comment letter went beyond mere citation in the SPOT EIS. Volume I of the SPOT Interim Final EIS, which is included in the administrative record, and which Defendants acknowledge was "primarily relied on" by

NMFS in drafting the BiOp, J.R. 5741, included a chart summarizing the public comments received in relation to the EIS. The chart includes 182 entries summarizing specific points made in the public comment letter, with a corresponding entry showing the action agencies' responses to the comments. Of these comments, there were approximately 90 responses stating that a particular section of the EIS had been updated or modified to address the comment, 11 of which related to the discussion of the oil spill risk analysis in the public comment letter or one of its attachments, such as the technical review by Dr. Lubetkin.

Although these comments and their responses suggest that the Coast Guard and MARAD considered the public comment letter in drafting the EIS, a review of the sections of the EIS referenced in the responses does not support the conclusion that the EIS "relied heavily" upon the public comment letter. *Save the Colorado*, 517 F. Supp. 3d at 899; *see Oceana*, 2017 WL 2670733, at *4. In the vast majority of instances, the section referenced in the comment response, while related to the issue asserted in the comment, did not discuss facts or analysis asserted in the public comment letter, whether to adopt them or to rebut them. For example, although one of the comments referenced the technical review's criticism of the assumption in the oil spill risk analysis that a leak would be stopped in 0.5 hours, or 30 minutes, the referenced section applied that standard without referencing or addressing the technical review's disagreement. Where the EIS acknowledged but generally did not adopt or even directly address the points raised in the public comment letter, the Court cannot find that the EIS heavily relied upon the public comment letter as required to deem it to have been indirectly considered by NMFS in preparing the BiOp. *See Save the Colorado*, 517 F. Supp. 3d at 899; *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1277. Similarly, although certain NMFS personnel provided comments on the SPOT EIS, the comments generally did not relate to, acknowledge, or directly address issues raised in the public comment

letter, including in relation to the oil spill risk analysis focused upon by Plaintiffs in the present Motion.

Indeed, the only instance identified by the Court in which a foundational report considered in making the agency decision was deemed to have sufficiently relied on another source that it was found to have been indirectly considered in the decision, the foundational study explicitly adopted fishing participation rates contained in the underlying source, an Interior survey, and that survey was one of only two sources cited in the fishing study. *Georgia River Network*, 2012 WL 930325, at *4–5. No such reliance occurred here. The Court therefore finds that Plaintiffs have not provided a sufficient basis to conclude that NMFS "constructively considered" the public comment letter in preparing the BiOp. *Ctr. for Native Ecosystems*, 711 F. Supp. 2d at 1276. The request to complete the administrative record with the public comment letter will be denied.

## II. Supplementation of the Record

Plaintiffs seek, in the alternative, to supplement the record with the proposed materials as extra-record evidence.

### A. Legal Standard

A plaintiff may seek to "supplement" the record with "materials which were not considered by the agency, but which are necessary for the court to conduct a substantial inquiry." *WildEarth Guardians*, 713 F. Supp. 2d at 1253. "A party challenging an agency bears a special burden of demonstrating that the court should reach beyond the record." *Sanitary Bd. of the City of Charleston v. Wheeler*, 918 F.3d 324, 334 (4th Cir. 2019).

The Fourth Circuit "has not clearly articulated" the circumstances under which supplementation is warranted. *See Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs*, 329 F. Supp. 2d 600, 610 (E.D.N.C. 2004). Plaintiffs argue, and NMFS does not clearly argue to the

contrary, that the Court should apply the factors set forth in *Hodges v. Abraham*, 253 F. Supp. 2d 846 (D.S.C.), *aff'd*, 300 F.3d 432 (4th Cir. 2002), under which supplementation is warranted when the additional evidence "(1) explains technical information or agency action not adequately explained in record; (2) shows an agency failed to consider relevant evidence; or (3) shows an agency, in bad faith, failed to include information it considered in the record." *Id.* at 855. *Hodges*, however, specifically adopted these factors in relation to a case involving a challenge to agency action under NEPA. *See id.* The Fourth Circuit has recognized "the importance of extra-record evidence in NEPA cases to inform the court about environmental factors that the agency may not have considered," as "a NEPA suit is inherently a challenge to the adequacy of the administrative record." *Ohio Valley Env't Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 201 (4th Cir. 2009).

Within this District, the *Hodges* factors have been invoked outside of the NEPA context and in the context of a BiOp issued by NMFS, but in that instance, the court effectively modified the second factor, which is the one most applicable here, to permit supplementation of the record with extra-record evidence that "illustrates a factor the agency failed to consider but should have." *Sierra Club v. Nat'l Marine Fisheries Serv.*, 711 F. Supp. 3d 522, 545 (D. Md. 2024). This formulation of the second factor aligns with the Fourth Circuit's statement that in an APA case, a court may consider affidavits not contained in the agency record when there was a failure to explain an administrative action so "as to frustrate effective judicial review," if such extra-record materials provide "evidence of whether all relevant factors were examined by an agency." *Roe v. Dep't of Defense*, 947 F.3d 207, 221 (4th Cir. 2020). It also generally aligns with the approach followed by other circuits in APA cases, under which supplementation is permitted, among other circumstances, "if background information was needed to determine whether the agency considered all the relevant factors," *City of Dania Beach v. Fed. Aviation Admin.*, 628 F.3d 581,

590 (D.C. Cir. 2010) (quoting *Am. Wildlands*, 530 F.3d at 1002), or when the court needs to determine "whether the agency has considered all relevant factors and has explained its decision," *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

The Court will therefore apply the standard adopted in *Sierra Club* and assess, as to the second factor, whether Plaintiffs have identified extra-record evidence that "illustrates a factor the agency failed to consider but should have." *Sierra Club*, 711 F. Supp. 3d at 545.

### B. Category 2: Consultation History Communications

As to the Category 2 communications, Plaintiffs assert that these materials "provide highly relevant information on the analysis and ultimate decision that the agency made" and constitute "relevant information that the agency should have considered when making its decision but chose to ignore." Mot. Complete Record at 25. As stated above, other than the records to be identified to NMFS for additional consideration, the materials in Category 2 are either privileged or non-substantive communications that did not "pertain[] to the merits" of NMFS's decision-making. *Portland Audubon Soc'y,* 984 F.2d at 1548. Thus, Plaintiffs' request to supplement the record with these materials is denied.

### C. Category 3: Public Comment Letter

As for the public comment letter, Plaintiffs argue that it should be included as extra-record evidence because it contains "'relevant evidence'" and "important 'background' information" that NMFS failed to consider in its analysis of oil spill risks. Mot. Complete Record at 27; *see* Reply at 13. Specifically, they claim that the comments "directly rebut assumptions" that NMFS relied upon in drafting the BiOp's worst-case discharge scenario, and that the comments provide evidence not otherwise included or explained in the record. Reply at 13. They also argue that, given that NMFS's ultimate jeopardy determination was primarily based on the oil spill analysis

in the Interim Final SPOT EIS, the public comment letter's discussion of the draft SPOT EIS oil spill risk analysis is "necessary to this Court's consideration" of whether NMFS considered all relevant factors in its decision-making. Mot. Complete Record at 25. They provide no persuasive argument why the public comment letter should be included for any of the other reasons identified in *Hodges* or *Sierra Club*: that it "explains technical information or agency action not adequately explained in record" or shows that NMFS acted "in bad faith" in failing to include information actually considered. *Hodges*, 253 F. Supp. 2d at 855; *Sierra Club*, 711 F. Supp. 3d at 541.

As to the issue of whether the public comment letter identifies factors that NMFS should have considered but did not, both *Sierra Club* and other cases demonstrate that an administrative record may be supplemented with certain information provided through declarations or reports prepared by outside experts to the extent that they demonstrate that the agency failed to consider a factor that it should have. *See Sierra Club*, 711 F. Supp. 3d at 543; *Oceana, Inc. v. Ross*, 454 F. Supp. 3d 62, 72–73 (D.D.C. 2020). The rationale for such an exception "comes into play where a party seeks to demonstrate that an agency decision was arbitrary because the agency did not consider some important aspect of the regulatory problem before it." *Oceana*, 454 F. Supp. 3d at 69 (quoting 33 Wright & Miller, Fed. Prac. & Proc. § 8391 (2d ed. 1987)). Under this exception, the document in question must be "necessary to identify factors" that the agency "did or did not consider." *Sierra Club*, 711 F. Supp. 3d at 543. Thus, "the document in question must do more than raise nuanced points about a particular issue; it must point out an *entirely new* general subject matter that the defendant agency failed to consider." *Oceana*, 454 F. Supp. 3d at 70; *Pinnacle Armor, Inc. v. United States*, 923 F. Supp. 2d 1226, 1234 (E.D. Cal. 2013). Nevertheless, in cases involving "a complicated, scientific analysis," "intermediary evidentiary factors which lead to the ultimate conclusion" may be considered a "relevant factor justifying supplementation of the

administrative record." *Oceana*, 454 F. Supp. 3d at 70 (quoting *Sw. Ctr. for Biological Diversity*, 131 F. Supp. 2d at 8).

In *Sierra Club*, in which the plaintiffs challenged a BiOp relating to proposed oil and gas leases in the Gulf of Mexico, the court found that the administrative record could be supplemented with a declaration from Dr. Lubetkin, the same outside expert who authored the technical review in the present case, because it illustrated that the agency "failed to consider two important factors: the actual probability of a one-million-barrel oil spill and the risk of other large spills over the 50-year window relevant to the BiOp." *Sierra Club*, 711 F. Supp. 3d at 543. In so ruling, the court noted that the inclusion of the declaration was not for the purpose of providing "a rival interpretation" of the agency's analysis, but to identify "an implication" of that study that the agency "did not consider but should have." *Id.* at 544.

In *Oceana*, the plaintiff sought to supplement the record with an extra-record declaration from a scientist who evaluated an NMFS report relating to a management plan for the sustainability of the dusky shark that concluded that additional accountability measures were not necessary. *Oceana*, 454 F. Supp. 3d at 65, 67. The declaration assessed the report's "use of data, analytical methods, and whether the conclusions in the Report have an obvious basis in the data presented and accepted scientific and statistical practices." *Id.* at 69. The court declined to supplement the record with the portions of the declaration that identified purported deficiencies in the report where the record showed that the agency had already considered those issues and explained why it did not include the methodologies and data identified by the declaration, as a "disagreement" with the agency's decisions on these issues was an insufficient ground for supplementation. *Id.* at 70. In contrast, the court allowed the supplementation of the record with the portions of the declaration that identified possible causes or explanations for the decline in dusky shark interactions and

mortalities, as the report had failed to provide information to "determine the likely cause of these declines," such as whether they can be attributed to "management versus declining fishing effort or lower dusky shark abundance." *Id.* at 71–72.

Here, Plaintiffs have not demonstrated that the full public comment letter and its exhibits serve to identify factors that NMFS did not consider in reaching its determinations in the BiOp. Indeed, the public comment letter specifically addresses the draft SPOT EIS, not the BiOp, so significant portions relate to environmental issues that do not bear on the impact on endangered species and critical habitats. For other sections, the public comment letter clearly addresses factors already considered by the BiOp, or Plaintiffs, who have the burden to demonstrate that supplementation of the record is warranted, have failed to articulate how they show that NMFS failed to consider a factor that it should have. *See Sanitary Bd. of City of Charleston*, 918 F.3d at 334; *Sierra Club*, 711 F. Supp. 3d at 541.

However, Plaintiffs have advanced certain specific arguments for why the public comment letter, or at least certain parts of it, identifies factors that the NMFS did not consider but should have. Plaintiffs focus on the BiOp's analysis of the effects on ESA-listed species of oil spills that may be generated by the proposed projects because the BiOp stated that the oil spill risk analysis "form[ed] the foundation" of its conclusion that the projects are not likely to adversely affect listed species. J.R. 144; *see* J.R. 143–160; 192–93. The BiOp's oil spill risk analysis relied on the analysis contained in the Interim Final SPOT EIS. Specifically, the BiOp chose to use one of the worst credible discharge scenarios contained in the Interim Final SPOT EIS to analyze the impact of oil spills on the listed species. Plaintiffs' public comment letter and attached technical review provided feedback on the EIS's oil spill risk analysis, including on the worst credible discharge scenario which the NMFS later incorporated into the BiOp.

In particular, Plaintiffs highlight several points relevant to the BiOp's oil spill risk analysis that are raised in the public comment letter and technical review but not currently included in the administrative record. These points include: (1) the BiOp failed to consider the total number and size of expected oil spills over the 30-year operational timeline of the SPOT project; (2) the BiOp failed to account for the "probabilities of different size spills originating from different locations" throughout the oil export process; (3) the assumption that a pipeline spill would only last one hour is unreasonable; (4) the assumption that, in the worst credible discharge scenario, SPOT would be able to detect an oil spill and shut down all operations within 30 minutes of the rupture is unreasonable and unsupported by evidence; and (5) the BiOp failed to analyze the impact of hurricanes and tropical storms on the risk of oil spills. Mot. Complete Record at 26–27.

On the first two points, the public comment letter asserts, in relation to the draft SPOT EIS, that there needs to be a quantification and evaluation of "the probability and frequency of all sizes of [oil] spills" that may occur during the operational lifetime of the SPOT project because such an analysis is needed to evaluate how frequently "a most likely scenario" will occur, "what amount of time the environment has to recover," and what mitigation efforts are needed to reduce the probability of an oil spill. J.R. 5078. The public comment letter further asserts that such an analysis "is equally important to conducting a consequence analysis," and that "understanding the frequency of oil spills is a necessary component in the risk assessment for SPOT." J.R. 5079. Relatedly, as to the second point, the public comment letter states that "[r]ecognizing and quantifying the various probabilities for different sized spills originating from different locations throughout the export process will engender a greater understanding of the risks involved" and that "the probabilities and sizes should be calculated … and fully address the oil spill risks along the entire SPOT project, both onshore and offshore." J.R. 5079–5080.

The Court's review of the BiOp reveals that it does not address the impact of numerous oil spills of all sizes over the entire lifetime of the SPOT project and does not state why it did not do so. The BiOp also does not analyze the probabilities of spills occurring at other locations, either onshore or offshore, even though the worst credible discharge scenario analyzed in the BiOp is modeled to occur "at a nearshore location and close to the SPOT [project]." J.R. 145. The BiOp states that it "chose the largest volume discharge scenario . . . as the scenario to analyze for this Opinion because we do not expect effects to ESA-listed species and critical habitat to exceed the effects of that Worst Credible Oil Spill Discharge scenario." J.R. 144. It also states that although "[b]oth the SPOT and [GulfLink] applicants conducted numerous modeling simulations of potential oil spill scenarios that could occur in upland, inshore, nearshore, and offshore locations," "the areas affected by the Worst Credible Oil Spill Discharge scenario generally overlap and encompass the aquatic areas that might be affected by the other smaller spill scenarios." J.R. 145.

By choosing to focus on the worst credible discharge scenario, the BiOp arguably did not need to consider these factors in relation to the frequency of a "most likely scenario," a factor discussed in the SPOT EIS but ultimately not relied upon by the BiOp. However, the BiOp does not explain why the analyses suggested by the public comment letter were not conducted in relation to the other reasons identified in that letter. Further, although the BiOp states that its reasoning for using the "largest volume discharge scenario" was that NMFS does not expect the effects of other oil spills to exceed the effects of the worst credible discharge scenario, J.R. 145, it does not explain how it reached that conclusion in the absence of the kind of probability and frequency analysis suggested by the public comment letter, and it does not show that it considered the potential risk of additional spills that could occur in addition to a catastrophic oil spill resulting in the worst credible discharge scenario. As for consideration of the prevalence of spills at different

locations, the BiOp likewise does not account for the potential impact of additional spills occurring at particular locations at times before or after a worst credible discharge scenario. The Court therefore finds that the public comment letter's discussions of these issues identify factors that were not considered in the BiOp but should have been and will allow supplementation of the record with the relevant portions of the public comment letter and the technical review, J.R. 5078–5080, J.R. 5251–5253, and J.R. 5270–5278.

The third and fourth factors identified by Plaintiffs provide critiques of the methodology used in the oil spill risk analysis. As to the third factor, the public comment letter states that the draft SPOT EIS's modeling report contains three "most-likely spill scenarios" that "only calculated a spill release occurring over the span of an hour" and "fails to provide an explanation for why it is reasonable to assume an unmitigated release would cease after an hour." J.R. 5075. This discussion does not identify a factor that should have been considered. The BiOp did not actually rely on the "most-likely spill scenario" described in the SPOT EIS but instead built its oil spill risk analysis around the worst credible discharge scenario separately discussed in the SPOT EIS. Under that scenario, as described in the SPOT EIS and in the BiOp, the oil spill was assumed to last up to 36 hours. Specifically, it was assumed that there would be an early loss of oil, prior to the closure of the leak after 30 minutes, resulting in a discharge volume of 63,750 barrels of oil, followed by late phase discharges, assumed to last up to 36 hours after the initial leak was stopped, involving a release of an additional 623,852 barrels. Where the BiOp did not actually adopt the assumption that an oil spill would last only one hour, NMFS did not need to consider this factor, and to the extent it did, the fact that it instead chose a model with a 36-hour time frame demonstrates that the factor was actually considered. Thus, this factor does not provide a basis to supplement the record.

In contrast, with the fourth point, the public comment letter identified a factor that the BiOp failed to consider or address. Plaintiffs argue that it is unreasonable for the BiOp's analysis to assume that a pipeline rupture in the worst credible discharge scenario could be detected and successfully shut down within 30 minutes. The BiOp does not justify the 30-minute shutdown time or otherwise provide the information it relied upon in determining this shutdown time. The public comment letter further asserts that this shutdown time "may not comport with evidence from past oil spill responses" and cited examples of oil spills that went undetected for more than 17 and 24 hours. J.R. 5077. The technical review demonstrates that increasing the shutdown time by even half an hour would increase the modeled discharge amount by over 60,000 barrels of oil. Nowhere in the BiOp does NMFS clarify the reasons it chose the 30-minute shutdown time, discuss any potential obstacles to complying with this shutdown time, or address the fact that even a slight increase in the shutdown time would increase the modeled discharge amount on which it based its effects analysis and its conclusion that oil spills are not likely to adversely affect the listed species. In this context, the shutdown time is an "intermediary evidentiary factor[] which leads[s] to the ultimate conclusion" of whether the worst credible discharge scenario would adversely affect the listed species. *Oceana*, 454 F. Supp. 3d at 70. Where this factor was not considered and should have been, the Court will permit supplementation of the record with the portions of the public comment letter and technical report addressing this issue, J.R. 5077–5078 and J.R. 5279–80.

On the fifth point, Plaintiffs argue that in its oil spill risk analysis, the BiOp fails to address the risk posed by hurricanes and tropical storms to "the probability and severity of oil spills." J.R. 5080. Among other issues, hurricanes and tropical storms can "damage the buoys, platform, or subsea pipelines" and "potentially change an oil spill's trajectory and scope." J.R. 5082. The only instance in which hurricanes are mentioned in the BiOp is a passing acknowledgment that "[o]il

spills associated with the proposed actions could occur for a number of reasons including equipment failure, human error, natural forces such as hurricanes, or a combination of causal factors." J.R. 144. The BiOp does not analyze if and how hurricanes and tropical storms could increase the probability or severity of oil spills and, in turn, how those impacts could affect the oil spill risk analysis and the assessment of adverse effects on ESA-listed species. Where the public comment letter identifies this issue and provides a discussion of how it could affect the oil spill risk analysis, it has identified a factor that should have been considered but was not. Thus, the Court will allow for supplementation of the record with the portions of the comment letter addressing this issue, J.R. 5080–5082.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Complete or Supplement the Administrative Record will be GRANTED IN PART and DENIED IN PART in that the Motion will be granted as to supplementation of the record with the designated parts of the public comment letter and technical review, and to the extent otherwise specified in the separate Order, and will otherwise be denied. A separate Order shall be issued.

Date: November 25, 2026

THEODORE D. CHUANG
United States District Judge